CLARA MADDEN CRESSWELL v. S. E. WAINWRIGHT, Appellant.

**Negligence:** PROXIMATE CAUSE. The proximate cause of an injury is ordinarily a question for the jury; and in this case the question of whether defendant's negligent operation of his automobile frightened plaintiff's team, thus causing her injuries, or whether

it was frightened from some other cause was, under the evidence, for the jury.

**Same.** The mere fact that a team became frightened at an automobile will not of itself render the owner or driver liable for injury caused by the frightened team. It must further appear that the driver was negligent in the operation of the machine, thus causing or contributing to the fright of the team.

**Same.** INSTRUCTIONS. Where the court correctly instructed that the mere fact of frightening plaintiff's horses and consequent injury were not sufficient to authorize recovery, without a showing that defendant was guilty of negligence in the operation of his machine which caused the injury, and thereafter instructed at length on the several alleged grounds of negligence, without again telling them that in addition to establishing any one of the grounds of negligence the plaintiff must also show that defendant's negligence occasioned the injury, was not sufficient to establish the proximate relation between the particular negligence and resulting injury; but the instructions were technically correct so far as they went and are not held to be reversible error.

**Same.** Where the court submitted grounds of negligence which, under the evidence could have had no proximate relation to the accident, the error was not cured by a general instruction that plaintiff must show that the particular negligence caused the injury; as the implication arose therefrom that if a particular ground of negligence was found there was sufficient evidence to sustain it without a finding that it was the proximate cause of the accident.

**Actionable negligence.** Actionable negligence is such an omission to use the degree of care for the protection of another from injury as should have been used under the circumstances, and which as a natural and continuous sequence caused the injury.

**Negligence:** SUBMISSION OF ISSUES: APPLICATION TO EVIDENCE. The submission of grounds of negligence as defined in the court's instructions, concerning which there was no evidence to show that the acts or omissions complained of caused or contributed to the plaintiff's injury was erroneous.

**Evidence:** ERRONEOUS ADMISSION. Where there is no legitimate purpose for which evidence is received or allowed to remain in the record, refusal to strike it out, or to instruct that it can not be considered for any purpose, is erroneous.

**New trial:** MISCONDUCT OF JUROR. The statement of a juror while the jury is deliberating on the amount of damages to be awarded,

that the defendant was well able to pay any judgment against him, and that he had seen defendant on other occasions negligent as charged, was such misconduct as to require a new trial.

*Appeal from Taylor District Court.*—HON. H. M. TOWNER, Judge.

WEDNESDAY, FEBRUARY 14, 1912.

ACTION to recover damages for personal injuries, alleged to have resulted to plaintiff by reason of the negligent operation by defendant of an automobile, causing the fright of a team of horses and the overturning of the buggy to which they were hitched, and in which plaintiff was seated. There was a verdict for plaintiff in the sum of $10,000, and from judgment on this verdict defendant appeals.—*Reversed.*

*McCoun & Burrell; Crum, Jaqua & Crum;* and *Tinley & Mitchell,* for appellant.

*W. M. Jackson, D. W. Higbee,* and *J. R. Locke,* for appellee.

McCLAIN, C. J.—For a full understanding of the bearing of the alleged errors committed by the lower court in the trial of the case, it will be necessary to recite quite fully the evidence introduced for the plaintiff, the sufficiency of which to justify a verdict against defendant is questioned by the appellant. The plaintiff, a married woman, residing with her husband on a farm near the town of Lenox, came to that town in the afternoon of August 9, 1909, in a buggy, driving a team of horses which she and other witnesses described as quiet and easy to manage, and not afraid of automobiles. She hitched her horses, about 4 o'clock, at the so-called "hitching rack" on the south side of Ohio street, running east and west through the

town; the place where the team was thus hitched being about one hundred feet east of Main street, which runs north and south. As hitched, the heads of the horses were towards the southeast, and they had on bridles with blinds, and the top of the buggy was up. Leaving the horses in this position, in which they remained until the occurrence immediately connected with the accident to be hereafter described, the plaintiff went to the home of her father on the north side of Ohio street almost immediately opposite the place where the horses were hitched, and remained there for supper. About 7 o'clock, while it was still broad daylight, plaintiff, accompanied by her mother, crossed the street from her father's house to the team, intending, after unhitching it, to drive east on Ohio street towards her home. Her testimony as to what then happened was as follows:

My mother went with me when I started home. Father and mother both went to assist me to go home. I untied the team. My mother was on one side, patting the horse on the neck; the team was named Bessie and Daisy. When I got into the buggy, I took hold of the lines, one in each hand; the team was standing perfectly quiet. The first thing I noticed about the team being frightened they turned their heads and shied. I did not know what caused them to do it. I held onto the lines, and they whirled and reared and turned with me. When they turned a half circle, I saw what caused the trouble. I saw an automobile by the Brown building, right west of me, coming towards me. It was Sam Wainwright's automobile. I said: 'Mother, there is an automobile. Catch Bess! Catch Bess, quick!' Mother caught hold of the rein; it was tied up to the backband. I went around once and a half before the buggy upset. Q. Where was the automobile when they became very violent? A. It would be turning south. It was not out of sight when I called for help. I saw some people standing on the corner, and I called for help.

In explanation of this testimony and that which is to be hereafter referred to, it should be stated at this place that plaintiff's mother was at the left-hand side of the team,

and took hold of the hitching strap attached to the bridle of the horse nearest her, named "Bess;" and that, notwithstanding her efforts to stop the team, the horses turned to the left, making two or more circuits in the street; and that in the course of their turning the buggy was cramped, and plaintiff was pitched out on the ground. The "Brown building," referred to by plaintiff, is on the northwest corner of the intersection of Ohio and Main streets, and therefore across the street west from the residence of John Madden, plaintiff's father. The Madden store building, hereafter to be referred to, is on the southwest corner of the intersection of the two streets and fronts east; and on the southeast corner of the street intersection is the Meagher building.

Mrs. Madden, the mother of plaintiff, testified that she went across the street with the plaintiff to see her off, and while the plaintiff unhitched the team, stood beside the horse "Bessie," the one on the left side of the team, with one hand on the bridle rein, the other on the neck of the horse, petting her; the team being headed a little southeast. As appears from the abstract, she continued as follows:

When my daughter untied the team, she began backing the team to start east; she gathered up the lines, and I asked her if she was all right, and she said she was. She had one line in her hand, fastened together. I came through under the rack to go home, and she was starting home, and the horses started up and started to whirl around in a ring. She hollered for me to catch them, hollered, 'Ma, catch Bess,' and I ran forward and got Bessie by the bridle rein and held on it, and I was not strong enough to stop the team; they kept going around in that ring, in that circle, and it took me around with them. They went around twice before she was thrown out. After the buggy was upset, the buggy toppled over. After she was thrown out, the team went around and came over near to where she was lying. If they had gone a step or two farther, they would have stepped on her . The road was dry and hard, and she fell in the road a little to one side of the traveled portion.

Where she fell, the ground was hard and dry. I did not let go of the horse after the buggy upset. I do not know what frightened the team. Q. What was the first thing in that vicinity that you observed to frighten horses? A. I didn't observe anything. Q. Well, did you notice Mr. Wainwright or his automobile? A. No, sir; I was too much engaged to notice anything. I don't pretend to say what frightened the team. Q. But you do say that they were standing quiet, and all at once they became frightened? A. Yes, sir; they were as quiet as any team.

On cross-examination, this witness testified that the team was going around in a ring when plaintiff asked her to take hold of them, and that the horses were scared; "they were jumping around like horses do when they are scared."

John Madden, the father of plaintiff, testified that when plaintiff went from his house across the street to the team he was going from the house toward and diagonally across Main street, and did not see plaintiff get into the buggy, but hearing her call, he looked towards her and knew that she was in trouble, and at once went in that direction; that as he looked, he saw an automobile coming from the west, as he thought, by the Brown building, near the back end of it, which would be seventy or eighty feet from Main street; that when he first saw the automobile he was ten or twelve feet from the corner of the Madden building, and did not again notice the automobile, and that when he looked towards the team the horses were headed towards the east and turning towards the north. Though he went directly to the team, the plaintiff was thrown out before he reached her.

One Hudson testified for the plaintiff that, standing at the corner of the Brown building, he saw the team "jumping and rearing around," looking toward the automobile, when he first noticed it; and that the automobile, which he noticed at the same time coming along Ohio street from a point further west than the Brown building, turned and "went down Main street pretty close to the east side;" and

that, according to his recollection, the team upset the buggy about the time the machine turned the crossing. On cross-examination, he said that the first he noticed was the team backing, Mrs. Madden having hold of the rein of one of the horses, and that the team kept turning until they made a circle and a half, when the plaintiff was thrown out; and that after he first noticed the automobile on Ohio street he did not observe it again until it was going south.

One N. C. Davidson stated that, as he was sitting on the south side of the Brown building, on the sidewalk, he saw plaintiff's team as she unhitched it, the heads of the horses being a little to the east, and that "at that time there seemed to be something that frightened the team, and they started to go around, and Mrs. Madden got hold of the one horse's hitch rein, and that pulled them around in a circle." He heard no one call out. About the time that the team showed signs of fright, he saw the automobile coming from the west opposite to him, and turn around the corner into Main street.

One Gordon testified that he was sitting with N. C. Davidson in front of the Brown building when his attention was attracted by the team, and saw plaintiff get into the buggy. He also noticed there was an automobile coming from the west on Ohio street, which turned south on Main street, "and while this automobile was turning around the corner this team made a whirl to the east, and upset the buggy," and threw plaintiff out. And, further: "Just as the automobile turned, I noticed the horses looking up, and as this automobile came around the corner, just as it was turning the corner to go down Main street, they turned to the east and made a whirl to the north, and I think the second time they came around that threw her out. The team turned to the east, and then to the north." And further: "When I first noticed the automobile, it was crossing the crossing that runs north. The team seemed to be standing quiet until it came up."

One Harry Davidson testified that, sitting at the corner of the Brown building, his attention was called to the team as they were backing and cramping the buggy and turning it; and that the first he saw of the automobile it was crossing the crossing, and had crossed over the Main street crossing before the team began to turn around; and that he thought the automobile got around the corner before the team cramped the buggy. ·

One McCracken testified that, as he was standing in front of the Madden store, looking east, he noticed the frightened team just as the automobile went around the corner; and that he did not know what caused the team to be frightened, although he saw nothing else calculated to frighten horses, except the automobile: And, further: "To the best of my knowledge, when I was looking east on Ohio street toward the team, the automobile had gone past and out of the line of vision before Mrs. Cresswell fell from the buggy." He said the team was not rearing or plunging, but only seemed frightened and going around.

One Bennett testified that at the time of the accident he was about to cross Main street in front of the Madden building, and did not observe plaintiff's team until after the automobile had passed and gone down Main street, and then, looking up, he saw people running toward the team.

Hugh Cresswell, the brother of plaintiff's husband, said that, as he crossed Ohio street east of the place where the team was hitched, he saw plaintiff's mother unhitching the team before they started; that the team was quiet when he saw it; and that he did not see, nor know at the time of, any accident.

It is apparent from this recital of all the evidence introduced for plaintiff, tending to show the frightening of

1. NEGLIGENCE: proximate cause.

plaintiff's team by defendant's automobile, that there is considerable room to doubt whether anything defendant did or omitted to do resulted proximately in plaintiff's injury. Aside from

plaintiff's own statement that she recognized the approach of the automobile as the occasion for the team becoming frightened, there is scarcely a *scintilla* of evidence that the action of the team had any relation to the approach of the automobile on Ohio street; and her inference to this effect, while no doubt admissible, is weakened by the conceded fact that the horses, blind-bridled, were standing with their heads to the southeast, and could not have seen the automobile until they had turned first east, then north, and had come to face toward the west, while the majority of plaintiff's witnesses observed the automobile turning south on Main street, and therefore passing out of sight of the team before the horses had proceeded further in their circle than to be facing north.   The plausibility of the inference is also weakened by the testimony of all the plaintiff's witnesses (which it has not been deemed necessary to specifically recite) regarding the character of the team; that it was used to automobiles, and not afraid of them.   This evidence, strongly put as it is by the witnesses, rebuts, of course, any contributory negligence of plaintiff; but it also bears strongly on the probability that the horses were frightened by the automobile, and on that account started on their circuit.   It does not appear that they were at any time frantic, and when bystanders came to the assistance of plaintiff they found the team standing near her, not apparently frightened.   The whole record suggests other possible explanations for the action of the team than fright due to the approach of the automobile; but, of course, the question of proximate cause was for the jury, and we can not say that its conclusion in this respect was wholly without support.

One other suggestion may well be made before we proceed to a consideration of the alleged errors in the court's instructions.   Even if the horses were

2. SAME.

frightened by the approaching of defendant's automobile, defendant should not have been held liable

in damages, unless he was in some respect negligent, and his negligence in such respect caused or contributed to the action of the horses in cramping the buggy. Defendant had a right to use the streets for the purpose of travel in an automobile. The mere fact that plaintiff's horses became frightened at his automobile would not in itself render him responsible for the consequences of such fright. *House v. Cramer,* 134 Iowa, 374; *Simmons v. Lewis,* 146 Iowa, 316. It could be only the failure of defendant to do something which, under the circumstances as they appeared to him, or should have appeared to him, as a reasonable man, he ought to have done, or the doing of something which, under such circumstances, a reasonable man in the exercise of proper care for plaintiff's safety ought not to have done, and which could be found by the jury to have resulted in the injury to plaintiff, that would justify a verdict against him.

Defendant and those who were with him in the automobile testified quite explicitly, and in the main without contradicting any of the testimony for plaintiff, that as the automobile came near Main street, they saw plaintiff's team backing away from the hitch rack and turning towards the north, but that the team exhibited no signs of being frightened by the approach of the automobile; and that, before any accident happened, or there was any indication of an impending accident, the automobile had turned south on Main street and passed beyond the sight of the horses. If the circumstances were correctly represented by these witnesses for the defendant, then, of course, defendant was in no way at fault. Even if he had, on reaching the Main street crossing, noticed that the team was frightened, he might well have thought, as a reasonably prudent person, that the most effectual precaution he could take to avoid the further frightening of the team was to turn south on Main street and get his machine out of sight and hearing of the horses as soon as practicable. We are not pre-

pared to say, however, that it was not a question for the jury to determine whether defendant acted as a reasonably prudent person should have acted under the circumstances; and that the jury could not properly find that at some point on Ohio street, before reaching the Main street crossing, defendant could, in the reasonable exercise of care and diligence, have discovered that the team was being frightened by the approach of his automobile, and by stopping his machine, have lessened the peril. Such a conclusion would, in our judgment, have been against the weight of the evidence, though not without support in the evidence; and the question as to the weight of evidence was for the jury.

II. In his instruction stating the issues to the jury, the court set out all the grounds of negligence alleged in plaintiff's petition, as follows: "That defendant was running the said automobile at an unlawful, high, and dangerous rate of speed; that defendant did not sound a horn or bell when approaching the plaintiff and the crossing; that defendant did not stop or slow down his automobile when he saw, or should have seen, that the horses which the plaintiff was driving were restive and becoming unmanageable; that defendant did not render such assistance to the plaintiff as was necessary under the circumstances; that defendant so operated said automobile as to make an alarming noise, calculated to frighten and alarm horses; that said automobile was painted a vivid and glaring red color, which in itself had a tendency to frighten and alarm horses"—and then instructed the jury as follows: "(1) Under the issues as stated, the plaintiff has the burden of proof, and must prove her claim and cause of action by a preponderance of the evidence, and must show: First, That the accident complained of was occasioned by the defendant in the operation of his automobile. Second. That with regard to the operation of the said automobile the defendant was guilty of negligence. Third. That the plaintiff herself was not guilty of negligence which contributed

3. SAME: instructions.

to her injury.  Fourth.  The plaintiff's injury and damage as a result of defendant's negligence."

The next instruction was to the effect that plaintiff must show, in order to entitle her to a recovery, that "the acts or fright of the team was occasioned by the automobile, as managed and operated by the defendant at the time," referring in this connection to other possible causes of the accident, none of which would entitle plaintiff to recover.

Following this, an instruction was given, the material portion of which was in this language:                    .

No. 3:  If you find that the accident complained of was occasioned by the defendant in the operation of an automobile, the next inquiry to be determined is, Was the defendant guilty of any negligence in the operation of said automobile which occasioned said accident?  The mere fact, if established, that the plaintiff's team was frightened, and she was thereby injured by the defendant's automobile, is not sufficient.  The plaintiff is required to go further and show that in the operation of said automobile the defendant was guilty of some negligence which occasioned the said injury.

The court proceeded then to give several instructions, relating to the specific grounds of negligence which had already been recited in the statement of issues, all of the same general purport, as follows:

No. 4:  The plaintiff contends that the defendant was guilty of negligence in running the said automobile at the time complained of at an unlawful, high, and dangerous rate of speed.  Under our law, no person shall operate an automobile on a public highway or street at a rate of speed greater than is reasonable and proper, having regard to the traffic and use of such highway or street, or so as to endanger the life or limb of any person, or, in any event, in the closely built-up portion of a city or town at a greater rate than one mile in six minutes.  Upon approaching a crossing of intersecting highways or streets, a person operating an automobile shall have it under control and operate

at a rate of speed less than one mile in six minutes, and in no event greater than is reasonable and proper, having regard to the traffic then on said highway or street, and the safety of others. A failure in any of these requirements constitutes negligence.

No. 5: The plaintiff contends the defendant was guilty of negligence in not sounding a horn or bell when approaching the plaintiff and the crossing. Under our law, every automobile is required to be provided with a suitable bell, horn, or other signal, in order to give warning to others of the approach of the machine. It is the duty of one operating an automobile to sound such bell, horn, or other signal, when approaching a crossing in a city or town which is thickly populated, or in turning a corner in such a place, or on approaching any person upon the public highway under such circumstances as would make such act necessary, in order to give timely notice and warning of the approach of the machine; and a failure to give such notice would constitute negligence.

No. 6: The plaintiff claims the defendant was guilty of negligence in not stopping his said machine, or slowing it down, when he saw, or in the exercise of reasonable care, should have seen, that the horses which the plaintiff was driving were restive and becoming unmanageable. It is the duty of one operating an automobile, when approaching another person on the highway driving a team, if he sees, or by the exercise of ordinary care should see, that the team which he is approaching is restive and becoming unmanageable, to stop his automobile, or to slow it down, if by so doing he can prevent injury to the person driving the team. A failure to stop or slow down under such circumstances constitutes negligence.

No. 7: It is claimed by the plaintiff that the defendant was guilty of negligence by not rendering assistance to the plaintiff. One operating an automobile, when he sees, or in the exercise of ordinary care should see, that a team upon the highway which he is approaching is becoming restive and unmanageable, should not only stop his own machine, but go to the assistance of the person driving the frightened team, if by so doing he can prevent injury to the said person driving said team. A failure in this regard constitutes negligence.

No. 8: The plaintiff contends that the defendant was guilty of negligence in so operating his said machine as to make an alarming noise, calculated to frighten and alarm horses. One operating an automobile must take notice of its characteristics, and if it is noisy, and calculated in that regard to frighten horses, in approachng them upon the highway, he should so operate such machine as not to frighten them, if he can do so in the exercise of ordinary care and caution. A failure. in this regard would constitute negligence.

No. 9: The plaintiff contends that the defendant was guilty of negligence in driving a car which was painted a vivid and glaring red color. The color of a car is a matter of taste with the owner or user. The law does not require any particular color to be used. If, however, the jury find from the evidence that the defendant's car was painted a vivid and glaring red color, and such as would have a tendency to frighten and alarm horses, greater care would be required in the management of such car than one whose color and appearance was not so likely to alarm and frighten horses. One in charge of a machine must always have in mind the particular characteristics of his car, and govern himself accordingly. A failure to use reasonable care in the management of such a machine, under circumstances calculated to frighten a team, would constitute negligence.

No. 10: Unless the jury find the defendant guilty of negligence on one or more of the grounds stated, and herein referred to, they should render a verdict for the defendant. The defendant's negligence in the matter complained of must be established, in order to warrant a recovery; and the inquiry should be limited to the specific charges of negligence herein stated.

In considering the correctness of these instructions as applicable to the evidence, we have occasion to inquire, first, whether the court sufficiently emphasized the necessity of a finding by the jury, as to each of these alleged grounds of negligence, that it had some proximate connection with defendant's injury; and, second, whether as to each of these alleged grounds of negligence submitted there was some

evidence tending to show its proximate connection with the
injury.

First.   It appears from instruction 1, above quoted,
the court correctly told the jury that plaintiff's injury must
be found to have been the result of defendant's negligence,
and then correctly stated in instruction 3 that the mere
fact of the frightening of the team by the operation of de-
fendant's automobile, and the consequent injury to plaintiff,
would not be sufficient to sustain a verdict against the de-
fendant; but that plaintiff must go further and show that
in the operation of the automobile the defendant was guilty
of some negligence which occasioned such injury. However,
after instructing at length with reference to the various al-
leged grounds of negligence, to the effect that a failure to
exercise the precautions recited would constitute negligence
on defendant's part, he concluded (instruction 10) with
the statement that, unless the jury found the defendant
guilty of negligence on one or more of the grounds stated,
it should return a verdict for the defendant, without cau-
tioning them that to authorize a verdict for plaintiff they
must not only find that defendant was negligent in one or
more of the respects referred to, but, also, that they must
find that the negligence of the defendant in one or more
of these respects occasioned or contributed to the accident
and plaintiff's resulting injury.   Taking all the instruc-
tions together, a lawyer could well understand that the find-
ing of such connection was essential; but we very much
doubt whether the jurors, after reading the long recital of
acts and omissions which might constitute negligence, would
bear in mind the necessity of going back to instruction 3
for the purpose of determining whether a finding of negli-
gence in any one of these respects would justify a verdict
for plaintiff.   It seems to us that the natural conclusion of
the jury, after reading instructions 4 to 9, inclusive, would
be, under instruction 10, that if they found negligence in
any one of these respects, then they could return a verdict

for the plaintiff, losing sight of the necessity of finding that negligence in such respect had a proximate connection with the accident. As the instructions were technically accurate, so far as we have occasion now to consider them, we would not, perhaps, be justified in reversing for the want of a more specific direction in instruction 10 as to the necessity of finding proximate relation between the specific negligence found and the resulting injury.

Second. But, if the court submitted to the jury for determination specific grounds of negligence which, under the evidence, could not have had any proximate connection with the accident, then we think there was error; for the submission for determination by the jury of the question whether, in any one of the respects alleged, the defendant was negligent would be a clear indication that, if in that respect negligence was found, then a verdict for the plaintiff would be justified. Such an error would not be cured by the general direction given in instruction 3 that plaintiff must show that such particular negligence occasioned the injury; for a submission to the jury of an issue as to any one particular ground of negligence would necessarily be a determination by the court that, if such ground of negligence was found, then there was sufficient evidence in the record to sustain, though it might not require, a finding that that particular negligence had a proximate connection with the accident.

While the term "negligence" is popularly used to indicate an act or omission which is, under the circumstances, wrongful, as resulting from the failure to exercise the proper degree of care for the protection of others, without regard to resulting injury to any particular person, the correct legal conception of negligence for which recovery may be had in a civil action— that is, actionable negligence—is such an omission to use the degree of care for the protection of another from injury as should have been used under the circumstances, and

4. SAME.

5. ACTIONABLE negligence.

which in a natural and continuous sequence causes damage
to the latter.   In other words, there is no such thing as
negligence in this sense, unless, as a natural consequence of
the act or omission complained of, damage has resulted to
the person complaining. 1 Shearman & Redfield, Negligence
(5th Ed.,) sections 3-6; 2 Cooley, Torts (3d Ed.) 1412;
Wharton, Negligence, section 3; Whittaker's Smith on Neg-
ligence, 3; *Roddy v. Missouri Pacific R. Co.,* 104 Mo.
234, (15 S. W. 1112, 12 L. R. A. 746, 24 Am. St. Rep.
333); *Hale v. Grand Trunk R. Co.,* 60 Vt. 605, (15 Atl.
300, 1 L. R. A. 187); *Hiese v. Chicago G. W. R. Co.,* 141
Iowa, 88.

We must look into the record, therefore, to see whether,
as to the various acts or omissions which,
under the court's instructions, might be
found to constitute negligence, there was any
evidence tending to show that such acts or
omissions occasioned or contributed to the injury to plain-
tiff.

6. NEGLIGENCE:
submission of
issues: appli-
cation to
evidence.

While there is evidence tending to show the operation
of defendant's automobile, just prior to the accident, at an
unlawful rate of speed (although plaintiff's witnesses, none
of whom showed any special qualifications for judging of
the speed of an automobile, differed as to the speed, some
fixing it at fifteen or twenty miles an hour, which would
be unlawful, and others at eight or ten miles an hour,
which would be lawful, unless, under peculiar circumstan-
ces, a lower speed might be required in the exercise of rea-
sonable care), we find no evidence whatever in the record
tending to show that an unlawful speed had anything what-
ever to do with the frightening of plaintiff's horses, even
though they may have been frightened by the approach of
the automobile. If they saw the automobile at all, it must
have been but for a moment, and after they were already
frightened; and it is inconceivable to us that a lower rate

of speed would have avoided the fright, if any, which occasioned the accident.

The testimony of the witnesses is in direct conflict as to whether or not defendant sounded the horn on his automobile as he approached the crossing at Main street; but, even if he did not do so, it is clearly apparent that plaintiff could not, if warned by the sound of the horn, have taken any precautions against the accident which she did not take, for the team was already backing away from the hitch rack and turning to the left, and plaintiff and her mother were using their best efforts to control the horses, when the automobile approached the Main street crossing. It is not pretended that the duty to give timely warning would not have been fully discharged if the defendant had sounded his horn as he reached the Main street crossing, when he would have been about 200 feet from the team. Under the circumstances, indicating that, if the team was frightened at all by the approach of the automobile, it was frightened in a way not to have been reasonably anticipated, either by plaintiff or by defendant, the sounding of the horn might in itself have constituted negligence; but, in any event, a failure to sound the horn could not have been the occasion of the fright of the team.

The failure of defendant to render assistance to the plaintiff could not, under the evidence, have caused or contributed to plaintiff's injury. Others who were nearer to the plaintiff in her peril than defendant could have been at any time, if he had stopped his automobile, proceeded at once to plaintiff's assistance, and before they could reach her she had been thrown out, and the injury had been done. The jury may have attached very considerable blame to the defendant for failing to manifest an interest in plaintiff's safety; but such lack of interest, even if it had been shown to exist, could not in any way have contributed to the injury which she actually suffered.

We discover no evidence in the record tending to show

that defendant's machine was making an unusual noise, and we think that the instruction as to the duty of one operating an automobile to operate his machine, if it was noisy, and in that respect calculated to frighten horses, so as not to frighten them was improperly given. Of course, it was defendant's duty to recognize the fact that the usual noise made by an automibile is one of the elements of danger in operating such a machine with reference to the possible frightening of horses; but we think that the court improperly referred to the subject of noise in such sense as to authorize the jury to assume that there was some evidence tending to show that defendant's machine was unusually noisy. There is nothing in the record to justify any such assumption.

We reach the conclusion that the court submitted to the jury, as possible grounds for recovery, those last above referred to, as to which there was no evidence tending to show that any one of them caused or contributed to the frightening of the plaintiff's team and the consequent injury to her, if such injury resulted from the frightening of the team, which was a question of serious dispute under the evidence.

III. Over objection for defendant, plaintiff's husband was allowed to testify as to the amount expended by him for medical treatment of his wife, rendered necessary by the injury she received in this accident, and, in ruling on a motion to strike out such evidence, refused to strike it from the record, with the statement that the matter would be covered by instructions to the jury. The only reference made to the subject in the instructions was contained in the statement that no allowance should be made for medical service and attendance or for hospital charges. It is apparent, therefore, that for some purpose the court allowed the jury to consider the expenses incurred by the husband in procuring medical treatment for his wife. In the record we find no

7. EVIDENCE:
   erroneous
   admission.

indication of any legitimate purpose for which the evidence was received or allowed to remain in the record; and we think the court erred in refusing to strike it out, and in failing to instruct the jury that it was entitled to consideration for no purpose whatever.

IV. Misconduct of the jurors in the consideration of the case was relied on for defendant in a motion for a new trial, which was overruled. It appears that during the discussion in the jury room as to the amount of damages to be allowed, statements were made by one or more of the jurors to the effect that the defendant was well able to pay any judgment that might be returned against him; and that he had been seen on other occasions running his automobile at a high rate of speed. The facts as to this matter were drawn out by examination of the jurors in open court, after the question had been raised on motion for new trial. Misconduct was thus manifestly shown; and we are unable to find in the record a sufficient reason for the conclusion of the trial court that it was without prejudice. It is true that those jurors who were examined as witnesses declared that they were not influenced in any way by these statements, but it by no means appears that none of the jurors were so influenced; and it does not appear, as contended by counsel for appellee, that these statements were not made until after the amount of the verdict had been agreed upon. Some of them testified that they first heard the statement as they were putting on their coats to leave the jury room; but others testified that such statements came to their attention before the amount of the verdict was determined. As a consideration of such statements was calculated to influence the jurors as to the amount of the verdict to be returned, we think that prejudice from the improper conduct of jurors in making such statements was not sufficiently disproved to warrant the action of the court in overruling a

8. NEW TRIAL: misconduct of juror.

motion for a new trial on this ground; and that the verdict should have been set aside.

For the errors pointed out, the judgment must be reversed and the case remanded for a new trial.—*Reversed.*