STATE OF IOWA, Appellee, v. ED WEGENER, Appellant.

CRIMINAL LAW: New Trial—Misconduct of Juror—Recital of
1  Former Crimes. Statements asserting the guilt of an accused of former crimes, wholly foreign to the one on trial and aside the record, and of a nature such as would prejudice the jurors against the accused, in view of the record, made by a juror to his fellow jurors during the deliberations of the jury in a cause in which the evidence of guilt and innocence is in sharp conflict, and made with strong and apparently positive assurance of their truthfulness, constitute such misconduct as to demand a new trial.

WEAVER, EVANS and PRESTON, JJ., dissent, holding that no prejudice resulted in the instant case.

CRIMINAL LAW: Trial—Instructions—Differentiating Phases of
2  Insanity. Different phases of insanity properly in issue before the jury should be carefully differentiated in the instructions. But confusing and intermingling such phases is not necessarily reversible error.

CRIMINAL LAW: Capacity to Commit Crime—Insanity—Degree
3  of Proof. It is not reversible error to instruct the jury that defendant must "*clearly*" establish his plea of insanity, though it is preferable to omit such qualifying term.

LARCENY: Subjects of Larceny—Check Obtained by Duress and
4  Fear. A check obtained from the maker by duress, fear and compulsion, is a subject of larceny. So held under a charge of robbery. Section 4831, Code, 1897.

BILLS AND NOTES: Validity—Fraud, Duress and Compulsion. A
check executed by the maker under duress, fear and compul-
sion—under threat of great bodily injury—is absolutely void as
between the immediate parties, *but voidable only as between
the maker and third parties.* Sections 3070, Code, 1897, 3060-
a52, 3060-a55, 3060-a56, 3060-a57, 3060-a59, 3060-a60, Code Sup-
plement, 1913.

*Appeal from Polk District Court.*—CHAS. A. DUDLEY, Judge.

TUESDAY, MAY 22, 1917.

DEFENDANT was indicted for robbery, convicted, and
appeals.—*Reversed.*

*Cummins, Hume & Bradshaw, Lester L. Thompson* and
*Frank T. Jensen,* for appellant.

*George A. Wilson,* County Attorney, and *Earl C. Mills,*
for appellee.

GAYNOR, C. J.—Defendant was accused of the crime of
robbery, alleged in the indictment to have been committed
as follows: On the 9th day of October, 1914, the defendant,
armed with a revolver, assaulted one Charles Ashworth;
put him in fear of his life, and feloniously and forcibly
took from him $20 in money and one check in the value of
$5,000, all being the property of the said Ashworth. The
defendant pleaded not guilty, and also tendered an issue as
to his sanity at the time the act was alleged to have been
committed by him. Upon a trial to a jury, the defendant
was convicted and sentenced to the penitentiary. From
this conviction he appeals. The defendant's complaint may
be divided into three parts:

1. Error committed by the court in its instructions
to the jury.

2. Misconduct of the county attorney in argument to
the jury.

3. Misconduct of one of the jury prejudicial to the defendant's right.

We will take these complaints in their reverse order. Before considering this complaint, it is necessary that we place in the record somewhat of the situation confronting the jury at the time they were deliberating. Defendant Wegener was 42 years of age; lived in the town of Valley Junction with his wife and children; had lived there for 14 years; had amassed a fortune estimated at $75,000; had been engaged in hotel, saloon and coal business; all his property was invested in the town of Valley Junction. He had an income at the time estimated at about $650 a month; was not financially embarrassed. He had been something of a drinker. He was on friendly terms with the prosecuting witness, Ashworth, and had done business with him for several years. Ashworth was a wealthy man; lived a short distance outside the city of Valley Junction. The evidence tended to show that, the night before the robbery, the defendant was at home, and apparently in good spirits. On the morning of the robbery, he went to his office at the usual hour; talked with his wife about decorating his automobile for a carnival that was soon to occur, and suggested that his boys be dressed in white, that they might accompany him in the automobile. On the day of the robbery, the defendant and the prosecuting witness met in the open streets of the city, conversed together and were seen together on the streets and in public places. Defendant invited the prosecuting witness to accompany him to the rear of one of his buildings to view certain rubbish that he thought ought to be cleaned up. From there, they passed to another building, for the purpose of looking over some repairs that were thought necessary. They entered this building together. Therein they were met by one Lavelle, armed with a gun and disguised. who, by the use of the gun, compelled the prosecuting wit-

ness to hold up his hands. Conflict arose between Lavelle and the prosecuting witness, in which it seems the prosecuting witness overpowered Lavelle, and had him down on the floor. He called to defendant to come to his assistance. Defendant did not respond, but requested the prosecuting witness to let Lavelle up, saying that there were others outside and that they would be murdered if they resisted any longer. Thereafter, Ashworth was conducted upstairs to a vacant room over a pool hall. Ropes were there, and the prosecuting witness was bound hand and foot; forced to sign a check for $5,000 and deliver the same to Lavelle. $20 in money passed at the same time from the prosecutor to Lavelle. Lavelle handed the check to the defendant and requested him to have it cashed, cautioning him not to mention what had transpired. Lavelle stood guard over Ashworth during the absence of the defendant. Defendant departed with the check. The check was never presented for payment. It was later found, unendorsed, in an adjoining room with some of Lavelle's clothing. Defendant went down, whether with the check or not, and met the prosecuting witness's brother; told him a story about himself and the brother's being held up by some bandits in the alley; said that the brother had been carried away in an automobile; made no mention of the check; said that $1,000 was demanded of him and $10,000 of the brother; said that he had sent for his thousand. About this time, one of defendant's clerks brought him a roll of money, and defendant said, "I have my thousand now." There was some evidence that, after that, defendant returned and talked with Lavelle in the hall near the door where prosecuting witness was tied; told Lavelle that the brother wouldn't do a thing for them; told Lavelle that he had better kill Ashworth; dead men told no tales. When the defendant told the brother that he had his thousand dollars, he asked the brother what he was going to do about the ten thousand.

After this, defendant disappeared and was gone for about a year. Lavelle was later captured, convicted, and sent to the penitentiary.

There was much evidence tending to show that there were hereditary taints of insanity in the defendant's family. The question of insanity was clearly for the jury, as was also the question of defendant's voluntary participation in the robbery. There was no question as to the conduct of Lavelle, and the defendant's presence during the whole proceeding. There was evidence of a pre-arranged scheme between Lavelle and the defendant to do what this record shows was subsequently done. That rests upon the testimony of Lavelle, and was denied by the defendant. It is true that Lavelle had done some work for the defendant, and, to a certain extent, had made the defendant's place of business his loafing place for several days prior to the occurrence of the matter complained of.

Before coming to the errors complained of, however, we might say that, in our judgment, the record presented a fair question for the jury upon the facts, and our consideration of the case will be confined to determining whether errors prejudicial to the defendant were committed in the making of the record upon which he was convicted. Every defendant charged with crime is entitled to a fair and impartial trial under the forms of law. The same power that made the law that punishes made also the law that protects. Every man is presumed to be innocent, and, upon such assumption, the law throws around him certain safeguards against conviction, not for the purpose of protecting the guilty, but for the purpose of guarding the innocent who may be wrongfully charged. The law neither denies nor affirms the guilt or innocence of the accused. That question is submitted to a jury. They are the triers of the fact. Defendant is entitled to the verdict of twelve jurors, uninfluenced by any consideration except the rec-

ord, as made, upon which the cause is submitted. Every man must be confronted with his accusers and has a right to be heard in his own defense, and matters may not be considered by the jury in determining his guilt or his innocence until he has had an opportunity to be heard in his own defense. This brings us to a consideration of the assignment touching the misconduct of the jury.

1. CRIMINAL LAW: new trial: misconduct of juror: recital of former crimes.

It appears that, after the jury had retired to consider their verdict, one of the jurors was in great doubt as to whether or not the defendant ought not to be discharged, on the ground of insanity. The affidavit upon which the misconduct is predicated is made by one Oransky, a juror in the cause. One Foster was also a juror. The affidavit sets out the facts, is corroborated by the testimony of other jurors, and is as follows:

"That when the jury retired for deliberation, I was in some doubt as to the question of guilt or innocence, and on the first ballot, with two others, I voted not guilty. That I felt that there had been nothing shown to us which indicated that the defendant had ever been anything else than a law-abiding citizen, and I could not understand how such a man in his right mind could suddenly attempt some crime of this kind. Some time before a verdict was agreed upon and before the final ballot was taken (I am unable to say positively whether before or after the second ballot, but my best recollection is that it was before the second ballot), the juror Foster stated in substance that Wegener had stolen eighty cars of coal from the Rock Island Railroad and had bribed switchmen to switch the cars in on his private spur; that it had not been discovered until after Wegener went away, and that it had been settled out of court by the Ills. I asked Foster if he positively knew that to be a fact, and he said that there was no question about it; that he had his information from someone who knew, and I under-

stood it was from someone who had taken part in the settlement of the coal matter. I knew then that the juror Foster was a railroad man. These statements were made very emphatically, and I was satisfied that Foster knew what he was talking about and I believed the statement to be true. I believe that one or more of the other jurors discussed this matter at that time, but I am unable to recall the exact statements made by them and who made them. There was also some discussion about the fact that Wegener's saloon was not operated in his own name, and I said that looked peculiar to me; that he evidently owned it, because it was turned over to his wife after he went away. My best recollection is that some juror said in substance that the reason he did not operate it in his own name was that he had been mixed up with a gambling house, and that the council at Valley Junction would not issue him a license. The jury was segregated for ten days on this trial, and during the confinement of the jury, between sessions of court and before the case was finally submitted to the jury, there was some discussion between jurors of the case, and some of the points brought out by the testimony. I cannot say how many times I heard such discussion, but I recall that I cautioned the jurors on at least one occasion that it ought not to be discussed. Enough was said at various times before the case was submitted so that, when the jury retired after final submission, I thought I knew about how most of the jurors would vote. The result of the first ballot showed that my judgment was practically correct. Three ballots were taken, and I did not vote guilty until the third ballot. I was thoroughly tired from the long confinement and strain of the trial, and I am unable to say how much influence the statements about the stealing of coal had on my mind; but the fact is that these statements were made at the time that I was attempting to determine the sanity or insanity of the defendant, and arguing that

I could not understand how a man who, so far as I knew, had always been a respectable business man could get mixed in this sort of a crime unless he were crazy."

The statements made by the juror Foster, as exposed in this affidavit, were clearly prejudicial to the defendant's right to have his guilt determined upon the record made. The State had accused him of this crime, which not only involved moral turpitude but exposed him to a long term of servitude in the penitentiary. It had been presented to the court upon the trial—the evidence upon which the State predicated its right to have this man's liberty taken from him. All that was proper for the jury to consider, in the determination of the ultimate fact, was exposed to their view upon the trial. Upon that record he was to be judged. Upon that record he was to be condemned, if condemned at all. After the evidence had all been closed, after the jury had retired, by this means there was injected into the case, without notice to the defendant, evidence which would not have been admitted if offered upon the trial. Through this means, there was brought to the jury a knowledge of a fact asserted by a member of their own panel as true, the truth of which the record shows these jurors had no reason to doubt. If true, it had a tendency to explain much of the conduct of the defendant which might otherwise seem inexplicable. At least, it seemed so to this juror, Oransky.

Conduct such as we have here is to be clearly differentiated, in its influence upon the mind and its effect upon the jurors, from mere argument of jurors, or mere statements of inferences drawn from admitted or proven facts, or reasons, however untenable, given by a jury in favor of conviction. This, for the reason that all these inhere in the verdict. Faulty and illogical argument made in the jury room by the jurors may not be considered by this court, but never has it been permitted that a juror assert, as upon his own knowledge, the existence of facts not introduced in evi-

dence, touching the guilt or innocence of the accused. Nor has it ever been permitted that a juror, when deliberating upon his verdict, may introduce to the jury, for its consideration during its deliberations, facts de hors the record, reflecting upon the life and character of the accused. That these statements would exercise some influence upon the jurors, we think manifest from the character of the statements, and from the manner in which they were delivered to the jury by Foster, and from the peculiar nature of this case considered in its entirety. Here, the evidence was in sharp conflict, in so far as the criminality of the defendant on the indictment was concerned, and as to the affirmative defensive matter upon which he rested his right to an acquittal. We cannot say what the verdict would have been had this evidence not been presented to the jury at the time and under the circumstances. We have had occasion to review this question in the case of *Douglass v. Agne,* 125 Iowa 67, and the record here presents a stronger reason than in the *Douglass* case. See, also, *Cresswell v. Wainwright,* 154 Iowa 167, this point discussed on page 186; *State v. Kirk,* 168 Iowa 244, particular point discussed in fourth division of the opinion, page 256.

It is true that in civil cases it has been held that if, upon the whole record, it appears that substantial justice has been done, and the verdict is clearly warranted by the evidence, the court will not interfere because of misconduct of a juror committed during deliberation. This rule cannot obtain in criminal cases, for the reason that the defendant is entitled to have the judgment of twelve men upon the whole record, as made, based upon a finding and pronouncement that, under the record, his guilt is established beyond a reasonable doubt. In determining this, the judgment of the jury must rest upon the record made upon the trial. See, also, *Kruidenier Bros. v. Shields,* 70 Iowa 428. We are clear that the conduct of the juror Foster was prej-

udicial to the defendant's rights, and for this reason, if for no other, the case must be reversed.

It is next contended that there was misconduct of the county attorney in argument. We have reviewed this question, but we do not feel that we are, under this record, in a position to say that the misconduct, if any, resulted prejudicially to the defendant. We have cautioned before against undue zeal in the prosecution of criminal cases on the part of county attorneys. It is true, however, that much of the conduct in argument can be accounted for as a necessary counter-irritant to what has been said on the part of the defense, with no thought or intention on the part of the prosecutor to bring about a conviction not justified by the record. We find no reversible error on this score.

2. CRIMINAL LAW: trial: instructions: differentiating phases of insanity. It is next urged that the court, in instructing the jury, failed clearly to differentiate between the several kinds of insanity that may be invoked in a case of this kind and presented in this case, on the record, for the consideration of the jury. The court, in one of its instructions, said, in substance:

"If you find that the defendant's act in committing the robbery was caused by mental disease or unsoundness which had dethroned his reason and judgment with respect to the act, which destroyed his power rationally to comprehend the nature and consequences of the act, or which, overpowering his will, inevitably forced him to its commission, then he is not guilty in law of any crime, and your verdict should be 'Not guilty.'"

This much of the instruction is not complained of. Immediately following this, and as a part of it, the court then said:

"The interests of society and the welfare of the state demand that this defense ought not to be regarded as sufficient to exculpate, unless you believe from the evidence

that the propensity to commit the act existed in such vio-
lence as to subjugate the intellect, control the will, and
render it impossible for the defendant to do otherwise than
to yield to the insane impulse," thus grouping two condi-
tions of mind referred to in the first part of the instruc-
tion as if they constituted but one condition of mind. The
court, in effect, said:

"The condition of the mind, in either case, ought not
to exculpate or excuse the defendant, unless the propensity
to commit the act existed in such violence as to subjugate
the intellect and control the will, and render it impossible
for the defendant to do otherwise than to yield to the
insane impulse."

By this last part of the instruction the jury were led
to believe that mental disease or unsoundness of mind
which dethroned the reason and judgment with respect to
the act, and destroyed his power of rationally comprehend-
ing the nature and consequences of the act, would not be
sufficient to exculpate, unless there was a propensity to
commit the act existing in the mind at the time, of such
a violent character as to subjugate his intellect and con-
trol his will, and to render it impossible for him to escape
from its compelling force.

The kind of insanity referred to in the first part of
the instruction is that which renders the person unable to
comprehend the nature and consequences of his act—ren-
ders him so that he has no intellectual conception of right
and wrong with respect to the act; while, in the other, his
intellectual conception of the act might clearly indicate
to him that it is right or wrong for him to commit the act,
and he might comprehend the nature and consequences of
the act, but, because of the existence of this insane impulse
in his mind, he is so subject to its control that he is power-
less to avoid the commission of the act; that it is, as the
court said, "impossible for him to do otherwise than to

yield to the insane impulse." The defendant was entitled to have both questions fairly before the jury. The court did this in the first part of the instruction, but in the last part practically withdrew from the consideration of the jury, as exculpating the defendant, any thought that he might be excused if the condition of his mind was such, at the time, that he was unable to comprehend the nature and consequences of his act, and did not know right from wrong with respect to the act, even though not driven to the act by an insane impulse that rendered it impossible for him to do otherwise than commit the act. The one is a man without a rational, moving, thinking mind; while the other is a man with a mind moving, active and controlling, but so diseased and perverted that he is pushed, as it were, by a demon at his back, into the doing of the act, without power to resist or control his action.

There are many phases of insanity, and it would be impracticable, if not impossible, for the court to cover all the possible phases. Insanity is a question of fact, and not of law. Courts have attempted many definitions, but no one definition is comprehensive enough to cover all phases of insanity. The court, in instructing the jury, therefore, ought to be controlled and guided by the record in the particular case in formulating its instructions upon this question. When, however, the court undertakes to instruct on different phases of insanity, on the assumption that these are phases which the jury must consider, the court ought to clearly differentiate between the different kinds of insanity submitted. In this particular case, we would not be inclined to reverse on this instruction alone, but, in view of another trial, we suggest that, if it becomes proper to submit these two kinds of insanity, the court should make the proper differentiation as herein indicated.

It is next contended that the court
**3. CRIMINAL LAW: capacity to commit crime: insanity: degree of proof.** erred in its instruction to the jury touching the degree of proof necessary to establish insanity. In this instruction the court said (the italics being ours) :

"Every person is presumed to be sane unless the fact is proven otherwise by a fair preponderance of the evidence, and you should treat the defendant as sane and his acts the acts of a sane person unless the evidence shows not only a possibility that his mental condition was otherwise, but further shows by a *fair* preponderance of the evidence in the case that defendant was then in fact irrational, or suffering from mental disease. You are not required to find the defendant was insane, unless the evidence *clearly* establishes such fact;" and that they should only find him insane upon evidence that convinced them that the fact of insanity was proven by a fair preponderance of the evidence. The criticism is of the use of the words "fair" and "clearly," and it is argued that they cast a greater burden than the law casts upon the defendant; that, if his insanity is proven by a preponderance of the evidence alone, he is entitled to an acquittal. There is some justice in the criticism. It would be better to omit these qualifying words, but an instruction similar to this was approved in *State v. Novak,* 109 Iowa 717. For the reasons stated in that case, we think no reversible error was committed by the court.

The next error assigned is that the
**4. LARCENY: subjects of larceny: check obtained by duress and fear.** court erred in its instructions in failing to distinguish properly between defendant's liability in regard to the check and defendant's liability in regard to the $20 in currency. The statute under which defendant was indicted is Section 4753 of the Code of 1897, which reads as follows:

"If any person, with force or violence, or by putting in

fear, steal and take from the person of another any property that· is the subject of larceny, he is guilty of .robbery, and shall be punished according to the aggravation of the offense."

· The contention of the defendant is that the check in question, signed as it was by the prosecuting witness. under compulsion and through fear, was not the subject of larceny. The theory of 'the defense is that, where one person compels another, under duress, to write his signature to a check furnished by the former, he commits neither larceny nor robbery by taking the paper, because nothing is taken from the possession of the owner except the naked signature to the paper. At common law, promissory notes and bills and checks are not the subject of larceny. They are merely promises to pay, and do not constitute property in contemplation of law governing the felonious taking of property. Our statute, however, has defined what constitutes larceny. Section 4831 of the Code of 1897 provides: .

"If any person steal, take and carry away of the property of another any money, * * * bond, bank note, promissory note, bill of exchange or other bill, order or certificate; or any book of accounts respecting money, goods or other things; or any deed or writing containing a conveyance of real estate; or any contract in force; or any receipt, release or defeasance; or any instrument or writing whereby any demand, right or obligation is created, * * * he is guilty of larceny, and shall, when the value of the property stolen exceeds $20, be imprisoned," etc.

It will be noticed that, to constitute robbery, there must be a taking from the person of another property which is the subject of larceny. Under our statute against larceny, any instrument or writing whereby any demand, right or obligation is created, is the subject of larceny. To be the subject of larceny, however, it must have some value. Sec-

tion 4849 of the Code provides, speaking of the measure of value of stolen goods:

"If the property stolen consist of any bank note, bond, bill, covenant, bill of exchange, draft, order or receipt, or any evidence of debt whatever, * * * or any instrument whereby any demand, right or obligation may be assigned, transferred, created, * * * the money due thereon or secured thereby and remaining unsatisfied, or which in any event or contingency might be collected thereon, * * * shall be adjudged the value of the thing stolen."

The record in this case discloses that Lavelle demanded $10,000 from the prosecuting witness; demanded this or his life; that, after some parley, he consented to reduce his demand to $5,000; that the prosecuting witness did not have this much money on his person at the time; that, through fear, and inspired by the conduct of Lavelle, in which, it may be said, defendant aided and abetted him, the prosecuting witness agreed to give his check. The defendant produced, for the use of the prosecuting witness, a blank check. The prosecuting witness wrote the check for the amount of $5,000 and signed it, and, still laboring under the fear impressed upon him by the conduct of Lavelle and the defendant, passed the check to Lavelle, who passed it to the defendant, with instructions to have it cashed at once and return with the money. This check was in due form and bore the genuine signature of the prosecuting witness. To a stranger, it bore all the indicia of being a genuine demand on the bank for so much money. If presented at the bank, it might have been paid. It was presumed to be of value to the amount stated in the check. It was drawn on the bank with which the prosecuting witness did business. By the making and signing of the check, the prosecuting witness, upon the face of the paper, parted with the amount of money in his bank covered by the check. He transferred his right to demand this money in the bank

to the defendant and Lavelle, and, on the face of the check, assigned so much of his money in the bank. At common law, this would not constitute larceny of a substantial thing, but, when the legislature made a check the subject of larceny, a promissory note the subject of larceny, a bill of exchange the subject of larceny, it made the taking of that which evidenced a right to a substantial thing—a thing the taking of which constituted larceny at common law—larceny. Any other theory of reasoning would lead us to the conclusion that there was no force in those provisions of our statute making the stealing of a note or check larceny, because the tangible thing taken would be, in and of itself, of no value. By the act, he stole the right to a substantial thing, a thing which, at common law, was the subject of larceny, and this justifies the statute. You take away the thing when you take away my right to the thing as evidenced by the instrument stolen. This is a departure from the common-law rule. It is the theory of the statute. It is the theory upon which rests the larceny of a writing, which, in and of itself, constitutes no tangible thing of value, but is of value simply because of the fact that a right to a thing of value is thereby created. When you take away the evidence of a right to it, in contemplation of this statute, you take the thing to which the writing gives evidence of a right. If deprived of the evidence of a right to a substantial thing—a thing which might have been a subject of larceny—by the act of larceny, you are, or may be, deprived of a thing of value.

5. BILLS AND NOTES: validity: fraud, duress and compulsion.    The only question here is whether or not this check was a subject of larceny. The statute makes instruments of this kind the subject of larceny; but the argument of the defendant proceeds on the theory that, because the check was brought into existence by the wrongful act of the defendant, and without the voluntary will and consent of the

maker, the thing was a dead piece of paper when taken, and therefore had no value. It was accepted and taken by the defendant, after it had been executed by the prosecuting witness, as a full compliance with his demands for $5,000. It was taken by the defendant from Lavelle with instructions to have it cashed and return the money. Why it was not cashed does not appear. It appears that some efforts were made indirectly by the defendant to induce the brother to furnish the money demanded by Lavelle. This purpose was not consummated. It is true that the paper upon which the check was written was furnished by the defendant; but, when the check was prepared and signed by the prosecuting witness, it then, upon its face, constituted a demand for money from the bank on which it was drawn. After it was prepared and signed, the same force operating that caused its preparation still continuing to operate, it was delivered by the prosecuting witness to Lavelle, and by Lavelle to the defendant. A demand for money, on the bank, was taken from the prosecuting witness by putting the prosecuting witness in fear, and it could well be said that the defendant, with force or violence, or putting in fear, stole and took from the person of the prosecuting witness property that was the subject of larceny.

The authorities to which our attention has been called are not controlling in a case like this, because of our statutes, to which attention is hereinafter called. There has been much discussion in the books as to the effect of duress in rendering negotiable instruments void or voidable. At common law, duress that would avoid a negotiable instrument was not considered unless it was carried to such an extent as to create in the mind of the maker of the instrument a reasonable apprehension of danger to his life or limb; unless he was forced to the execution of it through reasonable apprehension that, if he failed to execute it,

he would be subjected to great personal violence. A man has a right to protect his life, even to the taking of his assailant's life. The submission to coercive force of this character is not to be taken as a voluntary act of him who submits. He chooses, however, between the two alternatives, great bodily injury—imminent danger to his life— or the making of the negotiable instrument. Between the two, he has a choice. He chooses the latter, and executes the instrument. If it passes into the hands of an innocent purchaser, it is voidable, but not void. Some duty rests upon the person making the instrument to protect those who, in the ordinary course of business, might, in good faith, part with their money on the strength of the validity of the instrument created as the same appears upon its face.

The instrument in question was a direct demand on the bank to pay to the person to whom it was delivered the amount of money called for by the instrument. If the bank had paid upon this instrument the amount of money for which it was drawn, in good faith, in the ordinary course of business, without knowledge of the duress, it would seem that the maker would not be in a position to recover from the party the money so honestly paid upon the strength of the demand so executed. As between the parties to the duress, of course, a different rule would obtain, but, as to an innocent purchaser of a negotiable instrument, the statute provides (Section 3070 of the Code of 1897) :

"The want or failure, in whole or in part, of the consideration of a written contract may be shown as a defense, total or partial, except to negotiable paper transferred in good faith and for a valuable consideration before maturity, but if such paper has been procured by fraud upon the maker, no holder thereof shall recover thereon of the maker a greater sum than he paid therefor, with interest and costs."

As said in *Veach v. Thompson*, 15 Iowa 380, 382:

"To facilitate the business and commercial operations of the country, it is the policy of the law to impart to negotiable paper certain properties for the purpose of a free circulation; hence a bona fide holder for value before maturity is protected against all defenses which go only to make the note voidable, with certain specific exceptions, as incapacity, etc. * * * Duress, like fraud, does not make the note void, but only voidable."

See, also, *Callendar Sav. Bank v. Loos,* 142 Iowa 1. Section 3060-a52, Code Supplement, 1913, provides:

"A holder in due course is a holder who has taken the instrument under the following conditions:

"1. That the instrument is complete and regular upon its face.

"2. That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact.

"3. That he took it in good faith and for value.

"4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Section 3060-a55 provides:

"The title of a person who negotiates an instrument is defective within the meaning of this act when he obtained the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud."

Section 3060-a56 provides:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

Section 3060-a57 provides:

"A holder in due course holds the instrument free from any defect of title of prior parties, and free from defenses available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon."

Section 3060-a59 provides:

"Every holder is deemed *prima facie* to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as a holder in due course."

Section 3060-a60 provides:

"The maker of a negotiable instrument by making it engages that he will pay it according to its tenor, and admits the existence of the payee and his then capacity to indorse."

As bearing upon this question, see *State v. Thatcher*, 35 N. J. L. 445, in which it is said:

"The main question in the case is, whether our statute is impotent to punish the obtaining by false pretences a contract of suretyship. The note, in this case, and the paper upon which it was written belonged to the defendant; the prosecutor merely signed his name as surety, and returned the note to the defendant. Was this signature a valuable thing within the meaning of the fifty-second section of our act respecting crimes?"

It is said in that case:

"By the cheat, the prosecutor was moved to part with the thing of value, and was thereby placed in a position of jeopardy which he would not otherwise have occupied. The fraudulent intent was fully manifested in leading the prosecutor to assume a legal liability which subjected him to the contingency of loss."

Authorities are then cited pro and con. The question is then propounded:

"Is the maker's own note or contract of suretyship a valuable thing? The signing of the name was an act—the name, when signed, was a thing. Was it a thing of any value? While it remained locked up in his secretary, it was of no value to the maker, but *eo instanti* it passed out of his hands by the fraud, it became impressed with the qualities of commercial paper, and possessed to him the value which it might cost to redeem it from a bona fide holder. The moment Case delivered these signatures, he assumed a liability to pay $1,000, contingent upon their being negotiated. Can it, therefore, be said that a paper which imposed such a risk was of no value to the maker? Its value to him consisted not in what it would put in his pocket, if he retained it, but in what might be taken out of his purse by the delivery of it to the defendant," citing authorities.

The court then concludes:

"Under the contrary view, the fraud-doer, instead of obtaining from his victim, by false pretences, his bank notes, may defy the law, by resorting to the simple device of getting his check and drawing the money at bank, or he may practice deception with impunity on the bank by drawing their own circulating notes. Under our humane system of criminal law, judicial ingenuity should not exhaust its resources to reach an interpretation in favor of the wrong. In common and legal understanding, the language of our act is broad enough to comprehend the maker's own negotiable note or contract of suretyship, by which a piece of paper, before worthless, is stamped with an exchangeable value."

See, also, *Bork v. People of State of New York*, 91 N. Y. 5; *Hart v. Church*, 126 Cal. 471 (77 Am. St. Rep. 195); *Fairbanks v. Snow*, 145 Mass. 153 (1 Am. St. Rep. 446).

In this last case, the action was upon a promissory note against a woman and her husband. The woman contended that her signature was obtained by duress and threats on the part of her husband. The case was reversed because the court refused to rule that, if the defendant signed the note under duress, it was immaterial whether the plaintiff knew when receiving the note that it was so signed; the court saying that the ruling requested was wrong, both on principle and authority.

It will appear from the statute above quoted, and the authorities cited, that the check in question was not void, but voidable. It is true that it is void as between the parties, but not absolutely void as to innocent purchasers without notice, who, in the ordinary course of business, took it in good faith and paid a valuable consideration. The instrument might become a valid and enforcible obligation against the prosecutor. For that reason, it had some validity in his hands, and the taking of it from his possession by force and violence, was the taking of that which might be the subject of larceny. It was an obligation whereby a demand upon the bank for $5,000 was created. When it was taken from the possession of the prosecuting witness, it bore upon its face all the indicia of a demand by the prosecuting witness on the bank to pay to the payee named in the check the amount of money therein demanded.

Section 4849 of the Code of 1897 provides that, where an instrument which creates a demand for money is stolen, that shall be adjudged the value of the thing stolen which might, in any event or contingency, be collected thereon. We think the court rightly told the jury that the check was a subject of larceny.

There are other matters urged upon our attention by appellant which we do not think can arise on another trial, and are therefore not considered by us at this time. For the reasons pointed out, the case is—*Reversed.*

LADD, SALINGER and STEVENS, JJ., concur.

EVANS, J.—(dissenting).  I am not able to agree to the reversal of this case.  I put my dissent on the ground that the alleged misconduct of the juror resulted in no prejudice to the defendant.  The misconduct of juror Foster is not such as is contemplated by Code Section 5381.  That is to say, his statements did not purport to be "as of his own knowledge."  We have frequently held that a new trial will not be granted for misconduct of a juror unless prejudice be found.  *Hall v. Robison*, 25 Iowa 91; *State v. Cross*, 95 Iowa 629; *Carbon v. City of Ottumwa*, 95 Iowa 524; *Hathaway v. Burlington, C. R. & N. R. Co.*, 97 Iowa 747.  In obedience to that rule, the defendant has specified the prejudice in this: that the juror Oransky was unduly influenced by the statements of juror Foster.  Did the statements of juror Foster result in prejudice to the defendant in a legal sense?  In considering this question, we have no right to separate it from the record of the case in its entirety.  The evidence of defendant's guilt was overwhelming and practically undisputed.  The only defense put forward was that of insanity, and the evidence in support thereof was so unsubstantial as to be hardly worthy of the name.  A verdict of acquittal would have been a clear miscarriage of justice.  Likewise, only in less degree, would have been a disagreement.  There was no room under the evidence for a conscientious difference of opinion.  The jury returned the only verdict which it could conscientiously find.  This state of the record is a very important consideration, in that it reduced the probability, if it did not eliminate the possibility, of any legal prejudice to the defendant.  This was undoubtedly a proper consideration by the trial court.  It was so held in the *Cross* case, 95 Iowa 629.  That case was very similar in its facts to the case at bar.  The question of misconduct of the jury was presented on appeal.  In that case, as in this, a juror had stated that

the defendant had been concerned in previous offenses. Upon a consideration of the entire record, the manifest guilt of the defendant was deemed a proper consideration in finding that no prejudice was suffered. Quoting from the opinion:

"The evidence satisfies us that the defendant is guilty of the offense of which he was convicted, and we are of the opinion that the alleged misconduct of the jury furnishes no sufficient ground for a new trial."

In the *Hathaway* case, 97 Iowa 747, a juror had assumed to state, as of his own knowledge, facts material to the issue, and became thereby clearly guilty of misconduct. In that case, the court said:

"But this case should not be reversed on account of these acts of juror Joslin, if the verdict actually rendered was substantially just. In other words, if, in view of all of the evidence, the verdict effectuates justice between the parties, it should not be set aside, and the parties put to the trouble and expense of a new trial, because of the misconduct of a juror in the jury room. It seems to us, on a full examination of all of the evidence, that substantial justice has been done by the verdict rendered; that, under the view of the evidence most favorable to the plaintiff, he would only have been entitled to nominal damages, if any; * * * We are therefore of the opinion that we are not warranted in reversing this case for the misconduct complained of."

Turning now to the affidavit of Oransky for the specification of prejudice, the two following excerpts therefrom contain all there is therein on the subject of prejudice:

"That I felt that there had been nothing shown to us which indicated that the defendant had ever been anything else than a law-abiding citizen, and I could not understand how such a man in his right mind could suddenly attempt some crime of this kind. * * * I was thoroughly tired

from the long confinement and strain of the trial, and *I am unable to say how much influence the statements about the stealing of the coal had on my mind;* but the fact is that these statements were made at the time that I was attempting to determine the sanity or insanity of the defendant, and arguing that I could not understand how a man who, so far as I knew, had always been a respectable business man could get mixed in this sort of a crime unless he were crazy."

It will be noted from the foregoing that Oransky did not claim in his affidavit that he was influenced by Foster's statement to agree to the verdict. The utmost of his declaration was that he was "unable to say." The affidavit of the juror Butler reciting his conversation with Oransky immediately before the third ballot, which resulted in the verdict, tends to show that the juror Oransky was not influenced in his verdict by the statements of Foster, but was influenced solely by absence of evidence in support of the defense of insanity. In so far as there is dispute in the affidavits, if any, the facts should be found in support of the ruling of the trial court.

Upon the second ballot, the jurors stood 11 to 1 for conviction. Oransky alone voted otherwise. His affidavit sets forth the reason for his vote of acquittal. The reason thus stated and the state of mind indicated by it were themselves wholly unjustifiable. It is argued by the defendant that it would have been clearly prejudicial error if evidence of previous crimes of the defendant had been introduced on the trial. Let this be conceded. And yet this juror declared himself unable to believe the defendant guilty because it did not appear from the evidence that he had ever been guilty before. In other words, he would not permit himself to be persuaded of the guilt of a defendant on trial for his first offense unless it were made to appear that it was not his first offense. I take it that the majority deem

the doubts of the juror as justified by the defense of insanity. But the previous law-abiding character of the defendant was not put forward in support of such defense of insanity. Such hypothesis was not included in defendant's hypothetical question to his experts. The utmost, therefore, that can be claimed from Oransky's affidavit is that the statements of juror Foster drove out of his mind an idea that had no business there.

Surely, therefore, in the light of our previous cases, we ought not to ignore the state of the record before us, with its overwhelming evidence of guilt. We have frequently said that the trial court has a large discretion in the matter of granting or refusing a new trial on this ground. *Perry v. Cottingham*, 63 Iowa 41. Such discretion necessarily takes account of the entire record of the case. If I am right in saying that upon this record an acquittal or disagreement of the jury would have been a clear miscarriage of justice, will a reversal by us upon this ground be anything otherwise? I would affirm.

WEAVER and PRESTON, JJ., concur in the dissent.