STATE OF IOWA, Appellee, v. J. W. BUNN, Appellant.

**HOMICIDE:** Evidence—Weight and Sufficiency in re Insanity. Evi-
1  dence relative to the insanity of the accused reviewed, and held to
sustain a finding of sanity.

**HOMICIDE:** Manslaughter—Assault With Intent to Commit. Prin-
2  ciple reaffirmed that an assault with intent to commit manslaughter
is an assault made under such circumstances that, if death had re-
sulted to the person assaulted, the homicide would have been man-
slaughter.

*Appeal from Cherokee District Court.*—WILLIAM HUTCHINSON,
Judge.

OCTOBER 24, 1922.

REHEARING DENIED JANUARY 16, 1923.

THE defendant, being indicted for the alleged crime of
assault with intent to murder, was convicted of the included
offense of assault with intent to commit manslaughter, and ap-
peals.—*Affirmed.*

*Molyneux, Maher & Meloy,* for appellant.

*Ben J. Gibson,* Attorney General, *John Fletcher,* Assistant
Attorney General, and *Lew McDonald,* County Attorney, for
appellee.

WEAVER, J.—I.   The principal defense relied upon by the
appellant is that, at the time the alleged offense was committed,
he was insane, and that the assault, if any was committed, was
the result or product of an irresistible impulse,
which dethroned his reason, rendering him men-
tally irresponsible for his act.

1. HOMICIDE: evi-
dence: weight
and sufficiency
*in re* insanity.

Outlining the material facts, as to which there is little dis-
pute, it may be said that defendant is a married man, 50 years
old, residing with his family in the city of Cherokee. At some

time prior to the year 1918, Mrs. Gladys Smith and her husband, practicing chiropractors, entered upon the business of their profession in Cherokee. At first, the two families lived in the same house, and later, in the same immediate neighborhood. In the year 1918, Smith entered the military service of his country, leaving his wife and two children in possession of their home, and does not appear to have since returned to his family. A divorce followed. Mrs. Smith continued the practice of her profession. At times, in making her professional calls, she was driven about by the defendant in his auto; but, finding that this association caused unpleasant gossip, Mrs. Smith, in the summer of 1920, ceased to employ the defendant's services, and asked him to desist from seeking her society. The dissatisfaction experienced by defendant in being thus rebuffed by the woman, for whom he had developed a fondness, was later intensified by the fact that another man, one Griffin, called upon Mrs. Smith at her office, and appeared at various times to be paying her special attention. On the evening of the day of the shooting, Griffin took Mrs. Smith out, on an auto ride. Defendant, armed with a revolver, followed them some distance on the public highway, where he overtook the couple, and aiming the weapon at Griffin, pulled the trigger; but the gun failed to fire. Griffin got out of his car, and sought to take the gun away from defendant. Mrs. Smith also got out of the car, and tried to interfere in the struggle. At this time, the approach of another car on the road caused a cessation of hostilities for a minute or two, when defendant demanded of the woman to know if she was going to marry him, and upon her refusal, he declared that she should never marry any other man. Then he again produced the gun, and shot Mrs. Smith twice, inflicting severe, but not fatal, wounds upon her. Griffin succeeded then in getting possession of the weapon, and threw it away, and, placing the injured woman in the car, returned to town. Defendant followed them closely home, when he disappeared.

On the trial, the defendant did not testify as a witness, and the evidence offered in his behalf was confined principally to an undisputed showing of previous good character. There was also testimony by his business associates and acquaintances to the effect that he was a man of good business ability and

capacity, but that, beginning with the year 1918, being about the time when his infatuation for Mrs. Smith began to be noticeable, he showed signs of mental deterioration, which was manifested in an apparent lack of his usual interest in business affairs, and that he was often seen staring at the windows and doors of Mrs. Smith's office, as if to obtain a fleeting glimpse of its occupant. It was also shown that, after the shooting, the commissioners of insanity of that county considered the defendant's case, and the abstract shows that the record of the proceedings was offered in evidence, but it does not show whether the man was or was not found insane. It does appear that defendant, alone and unattended, drove his car to a hospital or "retreat" for cases of mental infirmity at Des Moines, of which he remained a guest or inmate for about 30 days, when he was discharged, with a certificate that he was then of sound mind. In response to a hypothetical question (which is not stated), an expert expressed the opinion that defendant was of unsound mind on June 19, 1921, and added that "a man suffering from unsoundness of mind *could* be impelled to do an act through uncontrollable impulse, due to unsoundness of mind or mental weakness,"—a conclusion of which we probably do not need the opinion of an eminent expert to convince us. But the hypothesis upon which the opinion was based not being preserved in the record, it is entirely without value. The trial court charged the jury very fully and fairly upon the law applicable to a defense of this character, and the verdict indicates that the jury did not find such evidence of insane or uncontrollable impulse in making the assault as would justify an acquittal on that score. Indeed, the proof offered in support of this defense is exceedingly weak and unconvincing, and any other verdict thereon would savor of a failure of justice.

II. Counsel complain of the court's refusal of a requested instruction on the subject of "irresistible impulse," and say that the instructions in fact given deprived defendant of his defense, unless the jury should first find that he was of unsound mind. The criticism does not appear to be justified. The court, in the twelfth paragraph of its charge, did recognize the distinction between general and partial unsoundness of mind, and told the jury that an act caused by mental disease or unsound-

ness which dethrones the reason and judgment with respect to the act and overpowers the will, irresistibly forcing him to its commission, would not constitute a crime. The court could not safely go further, and say that, when a man of ordinary mental soundness allows his angry and jealous passions to assume control of his conduct to the extent of taking the life of another, he could escape all responsibility therefor by pleading the very excess of his violence as proof of his innocence.

III. But the real point in the appeal, as we understand counsel, is in the proposition that there is no such crime, under the laws of this state, as an "assault with intent to commit man-

2. HOMICIDE: man-slaughter: as-sault with intent to commit.

slaughter." Were it a question of first impression in this court, the proposition could be maintained with some degree of plausibility. But it seems to us to have been so long since we first met and overruled the objection, and the precedent so set has been so often approved and followed, that it must be regarded as settled beyond recall, until the legislature, in its wisdom, decrees otherwise. See *State v. White,* 45 Iowa 325; *State v. Connor,* 59 Iowa 357; *State v. Schele,* 52 Iowa 608; *State v. Gaffeny,* 66 Iowa 262; *State v. Postal,* 83 Iowa 460; *State v. McGuire,* 87 Iowa 142; *State v. Smith,* 100 Iowa 1; *State v. Hoot,* 120 Iowa 238; *State v. Moore,* 129 Iowa 514; *State v. Brown,* 152 Iowa 427. In each and all of the cited cases, we have refused to adopt the view advanced by counsel for appellant. We are satisfied with the rule so established, and the question is no longer open to discussion. Indeed, even as an original proposition, the contention that the statute does not, in terms, recognize or define the crime of assault with intent to commit manslaughter is untenable. Admittedly, the statute does make manslaughter a felonious crime, punishable by imprisonment in the penitentiary. It also provides (Code Section 4772) that:

"If any person assault another with intent to commit any felony or crime punishable by imprisonment in the penitentiary, where the punishment is not otherwise prescribed, he shall be imprisoned in the penitentiary not more than five years, or be fined not exceeding five hundred dollars and imprisoned in the county jail not more than one year."

It is true that criminal statutes are to be construed strictly,

and are not to be extended, by construction, to include any offense not clearly within the fair scope of the language employed; but, giving that rule all due observance, it is difficult to imagine or to state any sound reason why an assault with intent to take life, under circumstances which, if the act were accomplished, would make it constitute the crime of manslaughter, is not punishable under this section. We are not content to follow counsel in their insistence that "intent is not an element in the crime of manslaughter." True, manslaughter is homicide without *malice*, but not necessarily without *intent*. *State v. Connor*, 59 Iowa 357; and see cases cited in 21 Cyc. 787.

The case seems to have been fairly tried. The fact of the assault with a deadly weapon is not disputed, except as it is put in issue by the plea of not guilty; and the only defense urged upon our consideration is that the act was committed under the influence of an irresistible impulse, or temporary insanity. That issue, as we have seen, was found against the appellant, and the record is without error requiring a new trial. The judgment below is—*Affirmed*.

STEVENS, C. J., PRESTON and DE GRAFF, JJ., concur.