# E. H. SLOAN v. STATE.

No. A-4081.    Opinion Filed Oct. 10, 1923.
(218 Pac. 717.)

(Syllabus.)

1.  **Homicide—Question of Guilt for Jury.** In a prosecution for murder, evidence reviewed, and held, that the issue of the defendant's guilt or innocence was for the determination of the jury, and that the defendant's conviction should not be interfered with by the appellate court.

2.  **Criminal Law—Test of Criminal Responsibility.** Under subdivision 4 of section 1511, Comp. Stats. 1921, the test of criminal responsibility for committing an act which is declared to be a crime is fixed at the point where the accused has the mental capacity to distinguish between right and wrong as applied to the particular act, and to understand the nature and consequence of such act.

3.  **Same—Irresistible Impulse no Excuse.** An irresistible impulse is not an excuse for the commission of a crime, where the person committing it is capable of knowing right from wrong.

4.  **Homicide—Acts and Declarations of Defendant Admissible on Issue of Insanity.** Upon a question of the insanity of a defendant charged with murder, evidence of his acts, conduct, and declarations, so far as they relate to, are connected with, or illustrate, or afford material evidence of, his mental condition at the time of the homicide, is competent and admissible.

Appeal from Superior Court, Creek County; Gaylord R. Wilcox, Judge.

E. H. Sloan was convicted of murder, and he appeals. Affirmed.

Thompson & Smith, for plaintiff in error.

George F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

DOYLE, J. In the information in this case, filed in the superior court of Creek county, the defendant, E. H. Sloan, was charged with the crime of murder; he having shot and killed his son, Kenneth Edwin Sloan. Upon his trial the

jury found him guilty of murder, and assessed the punishment at imprisonment in the penitentiary for the term of his natural life. From the judgment rendered upon the verdict he has appealed to this court.

The victim of the homicide, of which the defendant was accused, was the four year old son of the defendant. The mother of the child and wife of the defendant was killed by him at the same time. The tragedy occurred January 25, 1921, about 5 o'clock p. m., and the scene was the home of the defendant, about three miles north of the town of Slick. The defense was insanity.

Appellant asserts that the evidence was insufficient to support a conviction, and we deem it necessary to set it out at some length.

Will Dunham testified:

"I know the defendant. He lived with his wife and child in a tent within 100 yards of my house. He was an oil field worker, in the hire of McClung. On the day of the tragedy I went in my car to the store. I returned about 5 p. m. I saw defendant in his yard. He was waving his arms, and said, 'Will, come here.' I went to him. He said he had shot both his wife and child. I went into the tent and picked up the gun from a shelf inside the door. I saw his wife and son lying side by side on the floor. The little boy had a bullet wound over the left eye, and was dead. The mother was not dead. She died within an hour. She was unable to talk while I was there. The defendant said he would like to save his wife, and wanted to know about a doctor. I told him I had sent for a doctor."

J. J. Elliott, deputy sheriff, testified:

"About 8 o'clock p. m. on the day of the tragedy, Lee McClung came into the sheriff's office with the defendant, Ed. Sloan. A. H. Lyons, undersheriff, was there. The defendant said he desired to give himself up and wanted to

make a statement to me. Then we all went upstairs into the county attorney's office. Mr. McClung said to the county attorney, 'We have had an awful tragedy, and Mr. Sloan wants to make a statement to you.' The defendant sat down on a chair and said that he had killed his wife and baby; that he had been to the store with his wife and child; that when they came back he put on some dish water, and said to his wife, 'I will go over to the well while the dish water is heating, and will be back in a few minutes;' that he went, and stayed longer than he intended or expected to stay; that when he came back his wife was angry, and said, 'You never come back when you tell me you will,' and slapped him with the dish towel, and then with her open hand on the face; that he said, 'What did you want to do that for?' and she grabbed a pistol and said, 'I will end this now;' and he said, 'I will help you,' and he grabbed her; that in the scuffle the pistol was discharged, and she fell at his feet on the floor. Then he said, 'I thought I would kill myself, and I thought the child would be better off dead than left in this world motherless, so I turned and shot the child, and then went out and called for the neighbors. Then I tried to kill myself, and the gun jammed.' He was crying, and said, 'I am blaming no one but myself, and I am willing to take all of the blame and to pay the penalty.' "

A. H. Lyons, undersheriff, testified:

"I was in the sheriff's office when Mr. McClung and this defendant came in. The defendant started out by saying that he and his wife and baby had gone to Slick that afternoon, and they returned about 3 o'clock; that she asked him to build a fire and put on some water, so that she could wash the dishes, and he did so, then said that he would go down to the well, as the boys were having some trouble with the casings; that he stayed longer than he expected, and when he looked at his watch it was something like 5 o'clock; that he immediately went back to the house, and his wife remarked that she thought he was coming right back, then slapped him in the face with the dish towel, and she walked up closer to him and struck him on the cheek with her hand;

that he said to her she ought not do that, and she said, "I just as well end it now as later on;' and he said, 'Well, I will help you;' that she reached for the gun, and in the scuffle over the gun it was discharged, and she fell; that he turned and saw the child, and the thought struck him that he could not bear the thought of his child going through the world without a mother, and he decided to kill the child; that he did kill the child, and then turned the gun on himself, and it jammed; that he tried three different times, and the gun would not work. Then he went out and called for the neighbors."

It also appears that upon defendant's arraignment for preliminary examination on the 2d day of February, before the county judge of Creek county, the defendant, having been fully advised of his rights, waived a preliminary examination and asked to be taken before a court which had jurisdiction to receive his plea of guilty.

The evidence offered on behalf of defendant was wholly in support of the insanity defense. As a witness in his own behalf the defendant testified:

"I will be 29 the 24th day of April, 1921. My mother died of a self-inflicted wound at Bartlesville, June 11, 1917. I was married May 25, 1915, at Raton, N. M. One child, a boy was born of the marriage. He died January 25, 1921. My wife died the same day of a wound inflicted in a scuffle while I was trying to take a revolver from her. I went to the well, and promised to be back a certain time, and I stayed a little longer than I figured. Some of the boys called my attention to what time it was. I looked at my watch, and it was a quarter to 5. I went at once to the tent, and found my wife washing the dishes. I told her I would help her. I had been in the habit of helping her. I wanted to help her, and she told me to go to bed; then she came over and slapped me on the cheek. I don't know why. She went back to her dishes, and in a few minutes she said, 'I will end it all.' I had a revolver there, for her protection and the

baby's protection. It was hanging on the side of the tent. I believe, above the bed. She jumped over and grabbed it, and I grabbed her, and the gun was accidentally discharged, and my wife was no more. The first thing I knew that happened after that, I went to the bunkhouse and called Carl Metz. I told him to get a doctor and to call McClung. I have no recollection of shooting my baby boy. I don't know where the dear child was. I loved my wife more than any man on the face of the earth could love his wife, and my baby, too. There was no reason or cause or motive why I should want them out of the way.''

On cross-examination he stated:

''I went to the well, and got back about a quarter after 5. The boy came out to meet me. My wife was in the tent, washing the dishes. I carried my child into the tent with me. I do not know which, my wife or I, spoke first. She did not appear to be angry. I do not recall how long we talked before she took the gun from the wall; but it was only a few minutes, if it was that long. When she took the gun, she said, 'I will end it all.' She grabbed the gun. I do not remember that I said I would help her end it, or that in substance. I remember having a conversation with County Attorney Wagoner on the evening of this tragedy. Mr. McClung was present, too. I went to the county attorney's office with McClung, Lyons, and Elliott about 8:30 the evening of the day of the tragedy, and I made a statement in their presence to the county attorney. I do not remember that I said then that my wife went to the wall and took this gun off the wall, and said at that time that she would end it all, and that I said I would help her do it. We did not scuffle very long in the tent. I do not remember how long. I could not say whether it was five minutes or ten seconds. She had the gun in her right hand. She never changed it. I grabbed her, and forced her right hand behind her back over her left shoulder. It was in that position some way at the time the gun went off. I had one hand behind her, and the other one over her shoulder. I do not remember having the gun in my hand. I do not know where the boy was when we were scuffling. After the gun went

off, my wife was lying on the floor at my feet. I left the tent before I saw her in this position. I went after help. When I came back, she was lying on the floor, dead. Carl Metz came back with me. Carl went into the tent first. Bill Dunham was there at that time. I have stated all that I remember of the occurrence. I do not remember if I said, when I got back and my wife was shot, that 'I decided to kill myself.' I do not remember that in my statement to you I said, 'I turned and looked at the little four year old child on the floor, and said to myself, "Won't he be better out of the world than in the world a motherless child?"' I do not remember that I told you then I decided to kill the child. Not to my knowledge did I tell you that I shot the child. I did not tell you I then tried to kill myself, but the gun jammed. I did try to kill myself. I do not know whether it was before or after the child was killed. I do not remember having killed the child. The bullet entered my wife's head just above the left ear. I do not remember where the child was hit. I do not remember if upon more than one occasion since this tragedy I told you that I killed this child and wanted to pay the penalty. I remember my presence at the preliminary. I told you then to do as you pleased with it. I remember that I waived my preliminary, but not that I told you I wished to pay the penalty for killing the child, or that I had killed him."

His father testified:

"I am the father of defendant. Edwin is 29 in April. His mother is dead. She killed herself with a razor in the bathroom at our home. She was suffering from a mental malady at the time, and was under treatment for it. She was 50 years old at time of death. No insanity in my family, nor my wife's, that I know of."

Four doctors qualified and testified as medical experts, and answered the following hypothetical question:

"Q. Doctor, a young man 29 years of age, happily married, the father of a four year old boy, in a scuffle with his wife for the possession of a revolver, the gun was acciden-

tally discharged, shooting the wife in the head and killing her, immediately or a moment or so thereafter it appears that the defendant with the same revolver shot and killed his child, the defendant's mother, 50 years old, being afflicted with a mental trouble, committed suicide in a bathtub by cutting her throat with a razor, in your opinion would you say that the defendant was sane or insane at the time of shooting the child?''

Dr. Matenlee answered:

''He certainly would be insane; it was emotional insanity, brought on by the quarrel or scuffle with his wife, and the fact that he had accidentally killed her. Such a thing as this insanity, destroying the defendant's sense of right and wrong, is quite possible; he certainly did not know the difference between right and wrong, else he would not have acted as he did.''

Dr. Schwab answered:

''He was temporarily insane.''

Dr. McAlester answered:

''I would say that he was insane; I would not say that he did not know right from wrong.''

Dr. McCallum answered:

''I would say he was insane; the impulse of the defendant was emotional insanity and irresistible; it might be temporary; I do not believe the defendant knew right from wrong when he killed his child.''

In rebuttal, the state recalled the witnesses in chief who testified to acts, conduct, and declarations of the defendant, and giving as their opinion that the defendant was sane. At the close of the evidence the defendant demurred to the evidence and moved the court to instruct the jury to return a verdict of acquittal, which the court refused to do, and allowed exceptions.

It is contended in behalf of the defendant that the evidence shows that at the time of the commission of the crime the defendant did not have sufficient intelligence and self-control to understand the nature and quality of the acts committed by him, and to refrain from the commission of said acts, and that at said time he was mentally incapable and in a state of insanity; that the admitted circumstances, supplemented by the expert testimony, made out a positive case of insanity coincident with the crime charged, and being undenied by the state, the verdict is therefore contrary to the law and the evidence.

It has been repeatedly held by this court that it has no power to reverse a judgment of conviction upon the ground that the verdict is not supported by the evidence, unless there is no substantial evidence tending to show the guilt of the defendant, or that the evidence fails so far to support the verdict that the necessary inference is that the jury must have acted from passion or prejudice, or have been controlled in reaching their verdict by undue influence. This court adheres to the rule that a conviction cannot be had on the extrajudicial confessions of the defendant, without independent evidence of the corpus delicti. In this case, the corpus delicti was proved by independent evidence, and the issue of the defendant's guilt or innocence was clearly a question for the jury.

Our Penal Code provides:

"All persons are capable of committing crimes, except these belonging to the following classes: * * * Fourth, Lunatics, insane persons, and all persons of unsound mind, including persons temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against them they were incapable of knowing its wrongfulness." Comp. Stats. 1921, § 1511.

Our Code of Criminal Procedure provides:

"An act done by a person in a state of insanity cannot be punished as a public offense." Comp. Stats. 1921, § 2866.

Under subdivision 4 of section 1511, the test of criminal responsibility for committing an act which is declared to be a crime is fixed at the point where the accused has the mental capacity to distinguish between right and wrong, as applied to the particular act, and to understand the nature and consequences of such act. In the case of Adair v. State, 6 Okla. Cr. 284, 118 Pac. 416, 44 L. R. A. (N. S.) 119, this court said:

"It is immaterial what standard scientists or medical experts may fix to determine, or by what rules they determine, that a person is in a state of insanity; the accused under this provision of the law is a lunatic, or insane, or of unsound mind or temporarily or partially deprived of reason, to such an extent as will excuse him from criminal responsibility, only when he is incapable of knowing the wrongfulness of the act committed and charged, and incapable to understand the nature and consequences of such act, and this is a question of fact for the jury to determine under all the evidence in the case."

It has been pertinently said that in criminal cases the correct issue is not that of sanity, but of responsibility. 1 Whart. & S. Med. Jur. § 112. An uncontrollable impulse of the mind, coexisting with the full possession of the reasoning powers, will not warrant an acquittal on the ground of insanity. The question is always whether the accused, at the time he committed the act, knew its nature and character, and that it was wrong. Whart & S. Med. Jur. § 152, note 1.

The doctrine that an irresistible impulse resulting from a disordered mind relieves the criminal responsibility, though the accused was capable of distinguishing between right and

wrong with respect to the act in question, is not recognized in this jurisdiction. The capacity to know right from wrong, and to know that the particular act being committed is wrong, is recognized as the correct rule in Oklahoma to test the question of criminal responsibility. Roe v. State, 17 Okla. Cr. 587, 191 Pac. 1048; Snodgrass v. State, 15 Okla. Cr. 117, 175 Pac. 129; Owen v. State, 13 Okla. Cr. 195, 163 Pac. 548; Smith v. State, 12 Okla. Cr. 307, 155 Pac. 699; Alberty v. State, 10 Okla. Cr. 616, 140 Pac. 1025, 52 L. R. A. (N. S.) 248. In Roe v. State, supra, it is said:

"The statute of this state does not recognize the doctrine that one may be so possessed with an uncontrollable impulse as to compel him to do what he knows to be wrong and a crime, and yet be relieved from all criminal responsibility. A condition might be conceived of an uncontrollable insane impulse sufficient to relieve one of criminal responsibility under our statute; but this would only arise when the diseased condition of the accused's mind was such as to destroy the power of the accused to comprehend the nature and consequences of the particular act, and to know that it was wrong at the time of its commission."

The law presumes every person to be sane until insanity is made to appear, and upon the question of insanity of a defendant charged with crime, evidence of his acts, conduct, and declarations, so far as they relate to, are connected with, or illustrate or afford material evidence of, his mental condition at the time of the commission of the act charged, is competent and admissible. Reed v. State, 14 Okla. 651, 174 Pac. 800; McNeill v. State, 18 Okla. Cr. 1, 192 Pac. 256. In this case the conduct of the defendant clearly shows that he knew he was doing an unlawful act when he committed the homicide charged. His statements, as testified to by witnesses, that he thought the child would be better off dead than left in the world motherless, and that he killed

the child and was willing to pay the penalty, were not directly denied by him; he only says, "I do not remember making such statements."

Upon a careful consideration of all the evidence no doubt of the defendant's guilt can be entertained, and we think the jury gave the defendant the benefit of all that he was entitled to, on account of his condition of mind, by assessing his punishment at imprisonment for life. Our conclusion is that the defendant had a fair trial, with every right accorded to him that the law justifies or requires.

The judgment of the superior court of Creek county herein is accordingly affirmed.

MATSON, P. J., and BESSEY, J., concur.