STATE OF IOWA, Appellee, v. BERTHA M. BUCK, Appellant.

APRIL 3, 1928.

*Bollinger & Block* and *Chamberlin & Chamberlin*, for appellant.

*John Fletcher,* Attorney-general, *Neill Garrett,* Assistant Attorney-general, *John Weir,* County Attorney, and *Walter A. Newport,* Assistant County Attorney, for appellee.

KINDIG, J.—It is charged in the indictment that the defendant, Bertha M. Buck, the appellant here, murdered her husband in Scott County, by inflicting upon his body a mortal wound, on or about the 2d day of June, 1925. This was accomplished through the means of throwing burning gasoline upon his head, neck, and shoulders. Because of the injury thus received, her unfortunate victim languished until June 22d of that year, at which time he died.

Appellant, a woman 50 years of age, is educated, and had borne a good reputation in the community of Davenport. John W. Buck was appellant's third husband; she was twice divorced. Buck, the deceased, was 20 years her senior. They were married in 1911. On June 2, 1925, the date of the occurrence in question, these people lived at 2223 Brady Street, Davenport, where they owned a four-family apartment house. Mrs. Buck and her husband resided on the main floor; and between 6 and 7 o'clock in the evening of that day, they were eating in the kitchen. Some controversy arose concerning the current household bills and other expenses, which Mr. Buck refused to pay. Without warning, appellant rose from her place at the table, went to the sink, where a (pint or quart) jar rested, containing gasoline, which she picked up; and, after lighting the fluid, threw the burning contents directly upon the neck and shoulders of her helpless husband. He ran from the house, with his clothes afire, and was taken in charge by neighbors.

As before stated, appellant's defense was "insanity." More particularly, it is claimed she was afflicted with psychopathic personality of the excitable type. That mental condition, it is contended by appellant, made itself manifest in her, "probably from birth, and certainly since early maturity." Aggravation of that mental illness, it is urged, produced the "insanity" existing at the time of the killing. Such irritation, appellant argues, was family troubles, money worries, physical sufferings, menopause, operations, dizziness, and neuritis. Evidence was admitted, including medical testimony, tending to substantiate these torments and disablements, and the resulting "insanity." Regarding this, appellant testified:

"I got up from the table, and went to get a drink of water, back to the sink, where the water was. From the table to the sink was a matter of the length of those three panels [indi-

eating]. We had our supper in the kitchen. Mr. Buck [the deceased] was sitting in his usual place, the north side of the table, and the sink was right back of him. The jar that contained the gasoline was on the window ledge right above the sink. It was right back of Mr. Buck. I kept the gasoline there in the kitchen all the time. I was painting, fixing up the kitchen and the bathroom. * * * That night, at the time we were eating supper, I wouldn't say there was an inch of gasoline in it. It is a short inch. When I put it there, I thought it was just enough to finish. * * * The gas stove was in the other corner, by the sink, on the north wall,—the north side of the house,—the outside wall. The sink was in the left-hand corner, and the gas stove was in the right-hand corner. * * * The matches were on the stove. There is a little shelf right above the four flames. That is where the matches were, in a little tin container. * * * I don't know what happened after I came to the sink, because immediately there was this awful dizziness or flashes. * * * I can't explain how long it did take me before the gasoline was lighted. I cannot describe anything. It was just instantaneous, it seemed * * *. The first thing I knew, everything was just all flames; and when I saw things clear again, I was standing in the bathtub, pouring water on my gown.''

John W. Buck, appellant's husband, immediately after the event, told witnesses that his wife, the appellant, threw burning gasoline on his head and shoulders. Mrs. Mary Gustafson swore:

''The next day, when Mrs. Buck [the appellant] got up in the morning, she went about her usual household work, got breakfast, cleaned up her house, and dusted up. She showed me a glass jar sitting in the kitchen on the sink. She said that was the jar that she had had the gasoline in. She picked up the jar, and said, 'This is the jar that had the gasoline in.' And she said, 'I just threw it on him [her husband].' I was present next day, when she had a conversation with one of the tenants * * *. She asked the tenant not to move. She said she lost control of her temper.''

Much other and additional evidence was introduced, but the above is enough to understand the general nature thereof.

Nevertheless, the jury found that appellant was of sound mind when she committed the deed which resulted in the death of John W. Buck.

Many errors are relied upon for reversal. Generally, however, they relate to rulings on evidence and instructions to the jury. These assignments will now be the subject of our further review.

I. There is called to our attention the following decision on evidence:

George B. Maxwell, a witness, testified for the defendant:

"I remember the night of June 2, 1925, when I went to the Buck home. * * * Since then, I have seen Mrs. Buck [appellant] frequently. She has acted in remorse several times that I was there. Q. What do you mean by that? A. She was sorry that this occurred."

At this juncture, a motion was made by the State to strike the answer of the witness, and an objection was then interposed to the testimony, by the prosecution, with a request that it might appear in the record before the answer. Thence the court said: "I think it is proper, for the purpose of showing her mental condition." Mr. Bollinger, for the defendant, asserted: "Not mental condition,— just her mental attitude." Following this, the court sustained the objection, and appellant excepted.

In the first place, the objection and motion to strike had reference to the question, "What do you mean by that?" and the answer, "She was sorry that this occurred." It did not relate to the answer, "She has acted in remorse for several times that I was there." The avowed purpose of introducing the statements concerning appellant's "remorse" was to lay the foundation for the determination of her "mental condition" at the time of the act. Even to accomplish the object desired by appellant, there was sufficient in the record to show that she did have "remorse:" that is to say, the following was not stricken from the witness Maxwell's declarations: "She has acted in remorse for several times that I was there." Moreover, regardless of the foregoing, the court was willing to admit the evidence, to show appellant's mental condition, not at the time of the trial, but at the moment of the killing. Yet this was objected to by appellant, with the suggestion, "Not mental condition,—just her mental attitude."

Plainly, it can be seen that the "mental attitude" of this appellant at the time of the murder was quite immaterial. For-

sooth, it could have been any one of many different prejudices. Fundamentally, the criterion was "mental condition," and the "remorse" might, as the trial court suggested, have had some bearing as to what that was when the killing occurred.

Appellant cannot now complain of the court's ruling, because she invited it, and, in fact, is responsible therefor.

II. When appellant was testifying, she said, "My father died April 2, 1921." Thereafter, this question was propounded  to her: "I will ask you if, before his death, for some time he was out of his mind." To which there was interposed the objection, among others, that it was incompetent, and called for a conclusion of the witness. No answer was permitted by the trial court.

Foundation for reversal on this point is made by appellant upon the theory that, in view of the fact that her defense here is "insanity," she should have been allowed to go into the history of her family, and reveal traits of unbalanced mentality. Under proper circumstances and conditions, that may be done; but this witness was not a physician. She had not related any facts to the jury upon which her conclusion was based, nor was there any proof of the particular trait or peculiarity of her father's weakness. For all that appears, the parent's mental status may have been caused by his last illness, rather than "insanity." Wherefore, the inquiry did call for a mere conclusion, and was incompetent as such. See *State v. Hockett*, 70 Iowa 442, and *State v. Van Tassel*, 103 Iowa 6.

III. Complaint is made about the instructions because therein the court charged the jury that the burden of proof was upon the appellant, as defendant, to establish, by a preponder-  ance of the evidence, that she was "insane" at the time she threw the burning gasoline. The very nature of the act charged, the method used to produce death, and the surrounding circumstances, it is insisted, suggest "insanity," and such mental status appears therefrom, so that the burden of proving it, in such event, should not be cast upon appellant. Reliance for this doctrine is grounded upon *State v. Cooper*, 195 Iowa 258. In the *Cooper* case, however, this particular feature of the instruction was not consid-

ered; and when the court approved the charge there, reference was made to the specific objection raised.

Uniformly, this court has held that "sanity," not "insanity," is presumed, and there is nothing in the nature of the appellant's action in the case at bar which authorizes us to say that the rule should be different, as applied to her. Outrageous and hideous crimes are often committed. Sometimes it is difficult for humanity to understand why sane men will perform these acts. Certain psychologists and medical experts believe that no mentally balanced man can be guilty of such atrocity; yet, in the application of criminal law, it is necessary for courts to adhere closely to human experiences and the consensus of opinion drawn therefrom. Until some more scientific method is devised by legislation, this must be the policy of criminal jurisprudence. However this may be, there was evidence before the jury upon which it could find that appellant, at the time in question, retained her judgment, so that she rationally comprehended the nature and consequences of her act, and was persuaded by anger to do the fatal deed.

Thus, we cannot say, as a matter of law, that the jury was bound to believe, without evidence on appellant's part, that she there and then must have been "insane."

IV. Continuing her attack against the instructions, appellant singles out the following sentence thereof:

"In order to be an excuse and defense for a criminal act, the person accused and who claims insanity as a defense must prove that the crime charged was caused by mental disease or  unsoundness which dethroned, overcame, or swayed her reason and judgment with respect to that act, which destroyed her power rationally to comprehend the nature and consequences of that act, and which, overpowering her will, irresistibly forced her to its commission."

Her theory is that the statement covers two kinds of "insanity," total and partial, and therefore should have been divided.

For the sake of clearness, we here set forth the separation suggested, in the succeeding manner:

1. "In order to be an excuse and defense for a criminal act, the person accused, and who claims insanity as a defense,

must prove that the crime charged was caused by mental disease or unsoundness which dethroned, overcame, or swayed her reason and judgment with respect to that act, which destroyed her power rationally to comprehend the nature and consequences of that act.''

2. ''In order to be an excuse and defense for a criminal act, the person accused, and who claims insanity as a defense, must prove that the crime charged was caused by mental disease or unsoundness which, overpowering her will, irresistibly forced her to its commission.''

Expressing the thought in another way, she asserts that there can be an ''insanity dethroning the reason and destroying the power rationally to comprehend the nature and consequences of the act,'' without an insane irresistible impulse, based upon unsoundness of mind. And, on the other hand, she consistently advances the idea that there may be an ''insane impulse,'' without that condition of mind ''which dethrones reason and judgment and destroys the power rationally to comprehend the nature and consequences of the act.'' To sustain this position, appellant relies mainly upon *State v. Felter,* 25 Iowa 67; *State v. McGruder,* 125 Iowa 741; and *State v. Wegener,* 180 Iowa 102. There is language in the *Felter* case tending to support the principle advocated by appellant. We there said:

''But if, from the observation and concurrent testimony of medical men who make the study of insanity a specialty, it shall be definitely established to be true that there is an unsound condition of the mind, —that is, a diseased condition of the mind, in which, though a person abstractly knows that a given act is wrong, he is yet, by an *insane impulse,* that is, an impulse proceeding from a diseased intellect, irresistibly driven to commit it,—the law must modify its ancient doctrines and recognize the truth, and give to this condition, when it is satisfactorily shown to exist, its exculpatory effect.''

A close analysis of the *Felter* case, in the use of the language just expressed, necessitates also the consideration of the following quotation made by the court in that opinion, in reference to a case from another state: ...

''In a recent case in Kentucky, it is said that moral insanity is recognized by medico-jurists, and that 'the true test of responsibility is whether the accused had sufficient reason to know

right from wrong, and whether or not he had sufficient power of control to govern his actions.' ''

Then afterwards we summarized in the *Felter* case in this way:

''The jury, in substance, should be told that, if the defendant's act in taking the life of his wife (if he did take it), was caused by mental disease or unsoundness, which dethroned his reason and judgment with respect to that act, which destroyed his power rationally to comprehend the nature and consequences of that act, and which, overpowering his will, irresistibly forced him to its commission, then he is not amenable to legal punishment. But if the jury believe, from all the evidence and circumstances, that the defendant was in the possession of a rational intellect or sound mind, and allowed his passions to escape control, then, though *passion* may, for the time being, have driven *reason* from her seat and usurped it, and have urged the defendant with a force at the moment irresistible to desperate acts, he cannot claim for such acts the protection of insanity.''

Such, in all material respects, was the identical instruction given to the jury in the case at bar, and that charge has been directly or indirectly approved by this court from the day of the *Felter* case until the present time. *State v. Mewherter,* 46 Iowa 88; *State v. Hockett,* supra; *State v. McCullough,* 114 Iowa 532; *State v. Bunn,* 195 Iowa 9; *State v. Bogossian,* 198 Iowa 972.

Parenthetically, it is to be noted that the trial court, in the instructions about which complaint is made, carefully explained to the jury:

''To maintain the defense of insanity, it is not necessary that it should be shown by the evidence that the defendant, at the time of the commission of the act, did not know right from wrong as to her acts generally, or that she had been insane for any period before the time of the act charged.''

All the instructions given by the court below concerning ''insanity'' were full and complete, and covered all the ramifications presented by the appellant. Whatever may have been said in the *Felter* case, by way of dicta, is immaterial, when compared with the sample instruction there given by us. Especially is this true when that form has been followed, as aforesaid, up to this late date.

Directing our attention now to *State v. McGruder*, supra, we find this statement:

"* * * if there was any evidence that the act was the result of an irresistible insane impulse, it was not necessary, as was said in the seventh instruction, for the jury to find, in addition thereto, that the accused was of such imbecility or weakness of mind as to be unable to comprehend the nature and consequences of the act. Proof of either condition would entitle him to an acquittal."

Explanation as to what was meant does not appear, and no authority is cited. While it is there stated, "it was not necessary * * * for the jury to find, in addition thereto [the insane impulse], that the accused was of such imbecility or weakness of mind as to be unable to comprehend the nature and consequences of the act," yet we did not there hold that the "insane impulse" must not be sufficient to render the subject unable to "comprehend the nature and consequences of his act." Also, in this connection, we observe that the *McGruder* case was decided in 1904, and many times since that pronouncement we have approved the instruction objected to here.

*State v. Wegener*, supra, contains dicta which support appellant's position. In the *Wegener* case, the court, in the first part of the instructions, coupled the portion thereof relating to comprehension and consequences with that having to do with irresistible force, by the use of "or," rather than "and;" yet, when making the application, the court overlooked the "or," and treated the subject as if the conjunction used were "and." Therefore, inconsistency arose. During the discussion, however, the court went farther, and suggested that the use of "or" was proper, and in doing so, declared:

"The kind of insanity referred to * * * is that which renders the person unable to comprehend the nature and consequences of his act—renders him so that he has no intellectual conception of right and wrong with respect to the act; while, in the other, his intellectual conception of the act might clearly indicate to him that it was right or wrong for him to commit the act, and he might comprehend the nature and consequences of the act, but, because of the existence of this insane impulse in his mind, he is so subject to its control that he is powerless to avoid the commission of the act; that it is, as the court said, 'im-

possible for him to do otherwise than to yield to the insane impulse.' The defendant was entitled to have both questions fairly before the jury.''

On first reading, that would seem to be decisive of the present controversy; but, upon a more careful review, it is found that the entire statement was largely dicta, for we there concluded that the alleged error was not sufficient to warrant a reversal. Again repeating a thought often expressed in this opinion, also, after the *Wegener* case, this court continued to approve the ''comprehension and consequence'' charge to the jury. Even in a kleptomania case this was done. *State v. McCullough*, supra.

By the assumption of this position, we not only are consistent with our previous holdings in this respect, but are, in addition thereto, in accord with the greater number of American courts. 16 Corpus Juris 102, 103. That encyclopedia contains the following text:

''In many jurisdictions the courts, when insanity is relied upon as a defense, do not limit the test of responsibility to the mere capacity to distinguish between right and wrong, either generally or as to the particular act, but go further than this, and recognize that a person may know the nature and quality of an act which he does, and that it is wrong or contrary to law, and yet do the act under the influence of an insane irresistible impulse; and it is held in these jurisdictions that, although there may have been a capacity to distinguish between right and wrong as to the particular act, still the party is not responsible if the jury find that, by reason of duress of mental disease, he had so far lost the power to choose between right and wrong as not to be able to avoid doing the act, so that his free agency was at the time destroyed. *In most jurisdictions, however* [the italics are ours], the courts have repudiated this doctrine, and have limited the test of irresponsibility on the ground of insanity to the capacity to distinguish between right and wrong; so that an irresistible impulse, even though it is claimed to have been an insane impulse, does not exempt one from responsibility for crime, where his mental capacity was such that he had a knowledge of right and wrong as to the particular act; * * * Even in these jurisdictions, however, where the irresistible impulse is the result of mental disease sufficient to override reason and judgment, and

to obliterate the sense of right and wrong, it is a defense; for this brings the case within the knowledge of right and wrong test."

Among the more recent cases from foreign jurisdictions sustaining the "comprehension and consequence rule" we find: *State v. Carrigan*, 93 N. J. Law 268 (108 Atl. 315); *Commonwealth v. Cavalier*, 284 Pa. St. 311 (131 Atl. 229); *Sloan v. State* (Okla. Cr.), 218 Pac. 717; *State v. White*, 112 Kan. 83 (209 Pac. 660); *Collins v. State*, 88 Fla. 578 (102 So. 880); *Carnes v. State*, 101 Tex. Cr. 273 (275 S. W. 1002).

Manifestly, the dictates of humanity and its merciful tendencies require protection for the "insane." Injustice would result if such unfortunate beings were compelled to pay a penalty for taking a human life unintentionally, and through the loss of mental control. Every reasonable care should be taken to treat them, in such event, wisely, kindly, and gently. Nevertheless, in the pursuit of that endeavor, courts must consider all humanity, including the "sane," as well as the "insane;" for, if the fabric of civilization is broken down, and the State can no longer protect life, the result will be disaster, not only to the sane, but the insane, as well. Resultantly, great care must be taken to maintain and preserve law and order, to the end that human life is safe.

At this point, the troublesome question is to discover a criterion which will serve, under our present state of civilization, as a just standard to determine the status of the mind which is to be held responsible for crime. No human method of so doing can be perfect; and all schemes devised to measure the mentality doubtless will not always be exact. The safest course in jurisprudence seems to be that which experience reveals as the soundest and most practical; and the "comprehension and consequence rule" appears more nearly to meet this test. That principle has been followed by a majority of the courts, and we (with the exception of the dicta noted) have approved its application throughout the judicial history of this state, and therefore are inclined to continue under this "rule" until the legislature provides a better one.

Accordingly, the instruction given was proper, in view of the fact that the appellant, as defendant, at the trial emphasized the suddenness of her mental attack, which entirely enveloped

the mind, and, by some compelling influence, caused her to perpetrate the fatal deed. Furthermore, consistent with this, the trial court presented to the fact-finding body an additional and supplemental instruction, clearly and fairly defining the doctrine of temporary "insanity," as well as specific, distinguished from general.

Wherefore, the appellant has no just cause for complaint.

. V. Reversal is demanded because it is alleged the trial court, through its instructions, in an attempt to call the jury's attention to the things which they might consider a cause for appellant's "mental unsoundness," unduly limited the items thereof to her "family troubles." We have carefully read the record in this respect, and fail to find reason for the grievance. During the trial, reference was continually made to the basis of her insanity as "family troubles." More than this, the jury was told by the court to take into account, in addition to the foregoing, also "all other facts and circumstances shown in the evidence which to you, as reasonable men and women, throw light on the question."

There was no undue grouping of certain factors, to the subordination or obliteration of others.

VI. It is contended that the court below erred in failing to tell the jury that psychopathic personality of the excitable type was a mental disease.

The court, as a matter of fact, left this to be determined by that body, under the evidence in the record. In this there was no mistake, because there was a controversy among the medical witnesses concerning this very point. Dr. Ellis stated:

6. CRIMINAL LAW: trial: insanity: mental disease: jury question.

"A psychopathic personality of the excitable type is not necessarily a branch of insanity. I do not consider it one kind of insanity. I believe it is not usually so recognized in the profession."

While Dr. Morrow suggested:

"I made the distinction that insanity was acquired, and that a psychopathic personality was not. In other words, a psychopathic personality is a thing with which the individual is born; while insanity is something that is ingrafted upon the individual,—that is, from a later time in life."

Regardless of what appellant's experts may have said, the

court, under this conflict, was not justified in doing anything other than submit the controversy to the jury, under proper instructions. Certainly it is quite immaterial as to what the "insanity" was called, if, in fact, appellant was afflicted with it, and because thereof killed her husband; and the jury was fully and carefully informed concerning the defense grounded upon mental unsoundness, regardless of its name or particular designation.

VII. Next for our consideration is the proposition as to whether or not, under the record, the district court was warranted in presenting to the jury first and second degree murder. A brief review of the evidence at this place is enlightening. One witness, at least, gave information concerning threats made by appellant before the commission of the crime. And Officer Kuehl said:

"I asked Mrs. Buck [appellant] how the trouble in her home started, and she said she had had family quarrels for the last two or three years, and she lit the gasoline and threw it at the same time, and everything turned red, and she ran into the bathroom."

Corroboration of this statement is furnished by Officer Schroeder. Other incidents and circumstances suggest time for, and that there probably was, premeditation, malice, and a specific intent to kill. In any event, the jury could so have found. This position is supported by *State v. Baker,* 143 Iowa 224; and *State v. Hessenius,* 165 Iowa 415.

VIII. Likewise, there is support in the record sustaining the issue of manslaughter. Such homicide "is the killing of a human being without malice, and may be the result of anger, passion, or the reckless handling of a dangerous instrumentality." *State v. Quan Sue,* 191 Iowa 144.

Even much of appellant's own version of the incidents support this offense, and when her admissions are connected with the other conditions and facts revealed, we find ample foundation for the verdict actually returned by the jury; and she has no legal right to object because mercy was not shown her, and a lower degree of crime found against her. *State v. Quan Sue,* supra.

IX. Only the three issues were submitted to the jury: that is, murder in the first and second degree, and manslaughter. All

lower and included offenses were excluded therefrom; but in this  there was no error, for appellant was guilty of homicide or nothing. She inflicted the burning gasoline in such a way as to produce her husband's death. There was no intervening cause. *State v. Munchrath*, 78 Iowa 268; *State v. Baker*, supra; *State v. Dyer*, 147 Iowa 217; *State v. Hessenius*, supra. See, also, *State v. Quan Sue*, supra.

X. Several additional matters are argued, but they are not of such nature as to require a reversal. After a thorough and complete reading of the record and consideration of the problems presented, we are fully convinced that the appellant had a fair trial, and was convicted without passion or prejudice.

Therefore, the judgment of the district court must be, and hereby is, affirmed.—*Affirmed.*

STEVENS, C. J., and EVANS, FAVILLE, DE GRAFF, ALBERT, MORLING, and WAGNER, JJ., concur.